Commonwealth ex rel. Flannery et ux. *v.*
Sharp et al., Appellants.

Argued December 11, 1942.

Before BALD-
RIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*Samuel E. Bertolet,* with him *J. W. Bertolet, Henry
M. Koch* and *Theodore G. Confer,* for appellants.

*Walter Biddle Saul,* with him *Harry R. Matten,* of
*Matten & Matten,* for appellees.

OPINION BY STADTFELD, J., March 1, 1943:

This is a habeas corpus proceeding brought by paternal grandparents to obtain partial custody of their seven year old grandson from his mother and stepfather.

John Flannery, the 3rd, son of the petitioners, married the respondent, now Mrs. Sara E. Sharp. The couple resided with the petitioners and their son, John Flannery, the 4th, was born in the home of petitioners on March 13, 1935. The child's father died November 23, 1936. From that time on mother and child continued to reside with petitioners. On December 9, 1939, the child's mother married Charles Sharp, and the following month they established their separate home, with the child, in Birdsboro, about two miles from Monocacy, the residence of petitioners. As the court below, in its opinion, stated, "In view of the extreme attachment of the petitioners to the child, this marriage was not welcomed by them. And since the removal of the mother with her child to the home of her husband in Birdsboro, the relationship between the petitioners and Mr. and Mrs. Sharp has progressed from coolness to bitterness." The child was permitted to visit his grandparents frequently for some time after the mother's remarriage, but after February, 1941, he was no longer allowed to continue these visits. On May 6, 1942, fifteen months later, petitioners brought the present proceedings.

After hearing, the court below, on August 5, 1942, entered an order directing that "the petitioners be authorized to have custody of their grandchild, John Flannery, the 4th, at their home upon alternate Saturdays from about 9:00 a.m. until dark beginning August 8, 1942." The present appeal by respondent is taken from that order.

When, on August 15 and again on August 22, pursuant to the court order, the petitioner, Mrs. Jennie M. Flannery, called at the home of the respondents to take

the child for the day, the child refused to go. Thereupon, petitioners obtained an ex parte order of court directing the sheriff to take the child from the Sharp's home to the petitioners' home, the costs to be paid by respondents. The sheriff's deputy returned to the Sharp home after 12 o'clock noon on August 22, but by that time Mrs. Sharp had left for Reading to keep an engagement made several days earlier. On August 29, Mrs. Sharp had the child dressed and ready to go to his grandparents. The deputy sheriff called, and upon the child's refusal to go, he was forcibly taken by the deputy.

On September 2, 1942, a petition for hearing was filed by the Sharps and thereafter the court entered another order rendering the order of August 22 inoperative and fixing a date for further hearing. On September 12, Mrs. Sharp had the child dressed and ready again, but the child refused to go with the deputy who called. He was not taken on this occasion.

On Thursday, September 17, 1942, a hearing was held pursuant to the petition filed September 2, 1942 in the nature of a reply to the August 22d ex parte order. At this hearing the court received the testimony of Deputy Sheriff Haas as to what happened on August 22d and 29th; that of Mrs. Sharp and other witnesses, describing the occurrences on August 15, 22d, 29th and September 12th on the subject of the efforts made to carry out the August 5th order, and the results thereof. At the conclusion of the hearing the court below revoked the part of the August 22d ex parte order which had directed the Sharps to pay the costs of its execution, and ordered the costs involved in Deputy Haas' going to Birdsboro to be paid by the Flannerys.

On September 19, the child again refused to go. On September 26, the child was ill and confined to the house for several days. On October 2, the original

petitioners, the Flannerys, obtained a second ex parte order and the court below then again directed the sheriff to take the child from its home to the home of petitioners, the payment of costs to be determined at a hearing set for October 7. At the latter hearing testimony was taken indicating the child's refusal to go, although dressed and ready. On October 14, an effort was made to effectuate the court's order, by having a Mr. Docker, a mutual friend, call for the child in the absence of his mother or any other member of the family. To that end Mrs. Sharp got the child ready as usual, and then left the house. Nevertheless, the child refused again to go. On October 27, an order was filed fixing October 31, for further hearing. On that date after taking more testimony, that court directed petitioners to take their grandson and bring him back home at 1:30 P.M.

It appears from the testimony given at the hearing held before the court below prior to the order of August 5, 1942, that for sometime after Mrs. Sharp had remarried and established a separate home, she frequently permitted her son to visit his grandparents. This permission was withdrawn in February, 1941, for several reasons advanced by respondents and testified to at the hearing. Respondents' testimony, not entirely denied by petitioners, tended to establish the increasing hostility of the grandparents toward the child's mother and step-father, evidenced by their derogatory acts and conduct, their interference with the child's upbringing and the harmful effect upon the child. The court below was moved to remark to the petitioners at one point during the hearing: "You two folks have made the life of this young couple so miserable, I do not know what to think about it."

Nevertheless, when it came to entering the final decree, the court below was reluctant to deprive the petitioners of contact with their grandson, so that, in the

course of its opinion, the court stated: "We have purposely delayed a decision in this matter to permit animosities to subside. We have been unable after conference with counsel to achieve any mutual agreement whatsoever. We believe that the petitioners now realize the legal and moral right of the mother to the custody and direction of her child and that their future opportunities to have the child visit them depend upon their recognition of that right. And we believe that, despite the family estrangement, their child in its own interest, ought to be permitted to establish and to maintain reasonable contacts with its father's parents, who have in so many ways proven the actuality and the intensity of their love and devotion to it."

The course of events following the entry of the final decree failed to fulfill the hopes of the court below. The repeated incidents arising out of the efforts to enforce the court's order only served to substantiate the futility of the hopes and expectations of improved relations between petitioners and respondents. The testimony adduced at the various hearings held before the court below after the order of August 5, clearly established these conditions: (1) personal relations between petitioners and respondents had not improved, (2) the child was unwilling to visit petitioners on several occasions, but was forced to do so on one occasion, and (3) the health of the child was being seriously endangered by the emotional conflicts arising out of the manifest mutual animosities of petitioners and respondents.

The testimony of the child itself is significant. On each occasion when questioned by the court below as to why he did not wish to visit petitioners, the child's invariable response was, "Because they fight my mother."

The testimony of Dr. F. P. Lytle, the child's physician, given at the last hearing before the court below, has an important bearing upon an essential element of the case, viz., the welfare of the child itself. Sum-

marizing the testimony of Dr. Lytle, the court said: "I want you folks to know what the doctor has just said. He says that he thinks young John's condition due to this case, and the quarrels between the grandparents and the mother had the effect upon John of making him tend towards the neurotic; that several of his absences from school were due to intestinal disturbance in the upper part of the abdomen, and that in his opinion that disturbance is largely due to nervousness which was brought on by this controversy; that John a year and a half ago was a normal robust boy, and the doctor's prognosis is if this is kept up it will have a bad effect upon John in the future, which he doesn't exactly forecast or foresee."

It must be remembered that the governing consideration in a proceeding of this character is the welfare of the child and enforced visitations away from the home to which a child is accustomed may be injurious to its health: *Com. ex rel. v. Tweedy,* 74 Pa. Superior Ct. 577. And under the Act of July 11, 1917, P. L. 817 (12 PS §1874) the duty is imposed upon this court to consider the testimony and make such order upon the testimony of the case, either in affirmance, reversal, or modification of the order appealed from, as to right and justice shall belong.

The health and welfare of a child must not be shattered in the crossfire of supposedly conflicting legal rights as to its custody. Despite the fact that grandparents may have become so deeply attached to a child that it will be a real hardship to be deprived of his society, sympathy for them cannot be permitted to interfere with the best interest and future welfare of the child. While there may be little difference in the physical and material conditions in the two homes and in the financial ability of the respective parties to support and educate the child, the right of a parent to the custody of a child, all other considerations being equal, should incline the scale in the parent's favor: *Com.*

*ex rel. Welsh v. Welsh,* 96 Pa. Superior Ct. 426. Such custody, as between parent and grandparents, must be exclusive and uninterrupted, even to the refusal of visitations, when the welfare of the child is endangered by irreconcilable differences existing between them. It is reasonable to believe that were the grandparents, in this case, to cultivate a tolerable relationship with the child's mother and step-father, they might harvest the genuine affection of their grandchild, manifested by his complete willingness to make occasional visits to their home.

After a careful examination of the entire record, it becomes apparent that no useful purpose would be served in remanding the record to the court below for the purpose of taking further testimony beyond the 227 odd pages printed in the present record. It would be little more than repeating all that has been adduced at hearings following the entry of the final order by the court below.

The order of the court below is reversed and the writ is denied.