VICTOR GUALANO, JOSEPH DEL VECCHIO, MIRIAM MICALI, AND BERNARD ROSENFELD, PLAINTIFFS-APPELLANTS, v. BOARD OF SCHOOL ESTIMATE OF THE ELIZABETH SCHOOL DISTRICT, AND THE CITY OF ELIZABETH, IN THE COUNTY OF UNION, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued January 7, 1963—Decided February 18, 1963.

*Mr. Jerome C. Eisenberg* argued the cause for plaintiffs-appellants (*Messrs. Clapp & Eisenberg,* attorneys).

*Mr. Raymond A. Leahy* argued the cause for defendants-respondents.

The opinion of the court was delivered by

HALL, J.   The sole question in this case is when the amount to be raised by local taxation for the annual support of the public schools in a Chapter 6 school district must have the concurrence of the governing body of the municipality.   The statute, *R. S.* 18:6–53, provides that the amount determined and certified by the Board of School Estimate as necessary for

this purpose shall be appropriated and raised by the governing body through inclusion in the local tax ordinance, but "[n]o amount in excess of one and one-half per cent of *the valuation of the assessable ratables of any municipality as determined by the county board of taxation* shall be appropriated except with the concurrence and consent of the governing body expressed by its resolution duly passed." (Emphasis supplied) The answer to the question depends on the meaning of the emphasized language. The Law Division held, 72 *N. J. Super.* 7 (1962), that it had reference to the total assessments filed with the county board by the local assessor as revised and corrected by the board, *N. J. S. A.* 54:4–47 (prior to amendment by *L.* 1960, *c.* 51) and 54:4–48, rather than, as contended by plaintiffs, to the figure produced by the board's increase of the assessments to equalize them at true value with those of the other taxing districts of the county, *R. S.* 54:3–17, 18 and 19 (all prior to amendment by *L.* 1960, *c.* 51); *N. J. S. A.* 54:4–49.

The question is entangled in the thicket of numerous statutory limitations or requirements keyed to tax assessments in one form of language or another and designed for varying purposes. Decisions on somewhat similar questions, but involving different situations and different statutory language, have emerged in *Township of Maplewood v. Essex County Board of Taxation,* 39 *N. J. Super.* 202 *(App. Div.* 1956), *Township of Berkeley Heights v. Board of Education of Union County Regional High School District No.* 1, 23 *N. J.* 276 (1957) and *Essex County Park Commission v. Board of Chosen Freeholders,* 58 *N. J. Super.* 93 *(App. Div.* 1959), certif. denied 31 *N. J.* 294 (1960). In the first two cases the figure after equalization was held controlling. In the last one a conclusion was reached comparable to that of the trial judge in the instant case. We are convinced that all three cases were rightly decided on the particular facts, statutory language and underlying purpose. We are further of the view that the rationale of the *Park Commission* decision is applicable here, resulting in an affirmance. We say this despite

the substantial difference in the statutory language in the instant case, upon which plaintiffs rely in urging that the result should rather be like that in *Maplewood* and *Berkeley Heights*. Before giving the reasons for our conclusion, we should spell out with more particularity the exact situation before us.

As has been indicated, the Elizabeth school district is a so-called Chapter 6 district, meaning that it is governed by the provisions of Chapter 6 of the Education law, *R. S.* 18:6–1 *et seq.* While it is coterminous with the municipality it serves, *N. J. S. A.* 18:6–2, as are all school districts in New Jersey, *N. J. S. A.* 18:7–2, 18:5–17.1 and 18:8–1 (consolidated and regional districts being coterminous with more than one municipality), it is a separate corporate entity, distinct and free from the government of the municipality except to the extent that the Legislature has provided for connection or interdependence. *R. S.* 18:6–21; *N. J. S. A.* 18:6–23 and 24; *Merrey v. Board of Education of the City of Paterson,* 100 *N. J. L.* 273 (*Sup. Ct.* 1924); *George W. Shaner & Sons v. Board of Education of the City of Millville,* 6 *N. J. Misc.* 671, 142 *A.* 425 (*Sup. Ct.* 1928); see *Botkin v. Mayor and Borough, etc., Westwood,* 52 *N. J. Super.* 416 (*App. Div.* 1958), appeal dismissed 28 *N. J.* 218 (1958); cf. *Town Council of Montclair v. Baxter,* 76 *N. J. L.* 68 (*Sup. Ct.* 1908); *Board of Education of Long Branch v. Board of Commissioners of Long Branch,* 2 *N. J. Misc.* 150 (*Sup. Ct.* 1924); *Falcone v. Board of Education of Newark,* 17 *N. J. Misc.* 75, 78, 4 *A. 2d* 687 (*C. P.* 1939); *Board of Education of the City of Hackensack v. City of Hackensack,* 63 *N. J. Super.* 560 (*App. Div.* 1960); *Kaveny v. Board of Commissioners of Montclair,* 69 *N. J. Super.* 94 (*Law Div.* 1961), affirmed 71 *N. J. Super.* 244 (*App. Div.* 1962), certif. denied 36 *N. J.* 597 (1962).

Chapter 6 applies to all city school districts, except ones which choose to be governed by Chapter 7, and to those of any other municipality accepting its provisions. *N. J. S. A.* 18:6–2. The basic feature distinguishing the two chapters

is the almost complete absence of direct voter participation in school affairs under Chapter 6. Members of the Board of Education are appointed by the mayor or other chief executive officer of the municipality, *R. S.* 18:6–4, whereas in Chapter 7 districts (as well as in consolidated and regional districts), they are chosen by the electorate at the annual school elections, *R. S.* 18:7–4. In other than Chapter 6 districts, the yearly appropriations for the running of the schools to be raised by local taxes (levied and collected by the municipal government with all other taxes), as well as authority to raise and expend capital funds for the acquisition of land, the building of schoolhouses and the like, must also have voter approval. *R. S.* 18:7–78.

In Chapter 6 districts quite a different financial mechanism is prescribed. A Board of School Estimate is provided for, consisting of five members—two appointed by the Board of Education from among its membership, two members of the governing body selected by it, and the mayor or other chief municipal executive officer. *R. S.* 18:6–48. With respect to the annual appropriations for current expenses and repairing and furnishing the district schools, the subject of this case, the Board of Education is required to deliver to the Board of School Estimate, by February 1 of each year, its proposed budget of estimated expenses and revenues for the ensuing school year. *N. J. S. A.* 18:6–49. The latter board is directed to hold a public hearing thereon and, by February 15, "fix and determine the amount of money necessary to be appropriated for the use of the public schools in the district for the ensuing school year" and certify the amount so fixed to the Board of Education and the municipal governing body. *N. J. S. A.* 18:6–50. The governing body is required to appropriate the amount so certified, without change or other action on its part, by including it in the tax ordinance, *Townsend v. State Board of Education,* 88 *N. J. L.* 97 (*Sup. Ct.* 1915), except that it shall not make the appropriation without its affirmative concurrence and consent if the certified amount exceeds "one and one-half per cent of the valua-

tion of the assessable ratables * * * as determined by the county board of taxation." *R. S.* 18:6–53. The legislative scheme as to appointed school boards, is, therefore, to place in a separate, intermediate body, the majority of whose members are elected officials, the determination of the amount to be raised by taxation for current school purposes and, in addition, to give a kind of veto power to the whole municipal governing body when the figure fixed by the intermediate body exceeds a certain amount.

In January 1961 the Elizabeth Board of Education adopted a resolution fixing the basis of teachers' salaries for the ensuing school year and providing for the normal increment plus an additional increase for each teacher and a further adjust- ment in some cases. It thereafter delivered to the Board of School Estimate its proposed budget for the year calling for a local tax appropriation of $6,408,248.71, which included funds to provide the salary increases mentioned. The Board of Estimate, on February 14, certified to the City Council the sum of $6,308,248.71, the certificate being signed by the mayor and two of the four other members. The governing body, taking the position that the figure was in excess of the percentage limitation of *R. S.* 18:6–53 and that its concur- rence was necessary, refused to consent.

The present suit in lieu of *mandamus* and for a declaratory judgment was immediately instituted. The plaintiffs are school teachers and one of them is also a resident property owner and taxpayer. The complaint alleged that the "as- sessable ratables" had been fixed by the Union County Board of Taxation at $433,817,887 (the equalization figure) and that the amount certified by the Board of School Estimate ($6,308,248.71) was not in excess of 1½% thereof ($6,507,- 268.05). It was therefore claimed that the concurrence of the governing body was not required and a judgment was sought directing the appropriation of the amount certified by the Board of School Estimate as well as a declaration that the equalization figure was the base upon which the percent- age should be computed.

After the suit was commenced, but before answer filed, the Board of School Estimate rescinded its prior certificate and redetermined the amount to be appropriated at $6,147,730.86, a reduction of $160,516.85. The new certificate signed by the mayor and two of the other four members (not the two who had signed the original certificate) was delivered to the City Council on March 27 which concurred in the reduced amount the next day and included that figure in the tax ordinance. The Board of Education subsequently amended its budget and substantially reduced the proposed salary increases. It may be surmised that the difference of opinion between the school board and the governing body related to the extent of salary increases teachers should receive.[1]

The defendants' answer set up the subsequent action of the Board of School Estimate and the governing body as a defense[2] and asserted that, in any event, the proper percentage base was $156,589,858 (the total assessments made locally as revised and corrected by the county board).[3] One and one-

---

[1] An instance of an earlier controversy of similar nature between the same boards is found in *Board of Education of the City of Elizabeth v. City of Elizabeth*, 13 *N. J.* 589 (1953). Since the problem there arose in connection with an emergency, rather than the annual, appropriation, as to which the statute contains no provision requiring governing body concurrence under any circumstances, *R. S.* 18:6–55, 56 and 57, the limitation provision of *R. S.* 18:6–53 was not involved. But see the court's comment, 13 *N. J.*, at *p.* 591.

[2] We need not pass upon the validity or effect of this subsequent action, since plaintiffs base their case on the contention that the governing body was statutorily compelled to appropriate the figure set forth in the original certificate of the Board of School Estimate. There is a void in the statute as to what may or must occur when consent of the governing body is required and refused. Another litigation by different plaintiffs, decided by the same Law Division judge on the same day, attacked this subsequent action as nugatory. *Barber v. Board of School Estimate of Elizabeth*, 71 *N. J. Super.* 556. The court held that the City Council had power, after refusing consent, to appropriate any amount it decided upon between the one and one-half per cent minimum and the rejected figure. The case was not appealed.

[3] The two valuation figures referred to in the respective pleadings are found in the 1961 "abstract of ratables" of Union County prepared and filed by the County Board of Taxation pursuant to *N. J. S. A.*

half percent of this figure is \$2,348,847.87, far exceeded, of course, by both certifications of the Board of School Estimate.

There being no factual dispute, the trial court denied plaintiffs' motion for summary judgment and granted that made by defendants. Plaintiffs' appeal was certified on our own motion while pending in the Appellate Division.

Recital of why we think this case must be decided the way it is has to begin with the statutory mechanics of property tax assessments. We are particularly interested, as bearing on the matter of legislative intent with respect to the language now found in *R. S.* 18:6–53 which we are called upon to construe, in the prescribed scheme in 1922 when this language was introduced into then section 75 of the school law (*L.* 1903, (2d Sp. Sess.), *c.* 1) by amendment, *L.* 1922, *c.* 248. We hasten to add, however, that essentially the same structure existed before that date and has remained effective to the present time. We may, therefore, validly refer to present law (excluding *L.* 1960, *c.* 51, not yet effective), derived in the pertinent respects from *L.* 1918, *c.* 236, and *L.* 1917, *c.* 31 (replaced by *L.* 1934, *c.* 191), as descriptive of the situation both in 1922 and in 1961.

Stated as simply as possible, the scheme is this: the local assessor must assess all taxable real and personal property

---

54:4–52. (The document is referred to in this statutory section as the "table of aggregates." The differing terms describe the same document. In other parts of the tax law, it is referred to as the "abstract of ratables." *E. g.*, *R. S.* 54:1–33). The figure relied on by defendants is found in column 7 of the abstract (item 7 in *N. J. S. A.* 54:4–52) and that by plaintiffs in column 11 (item 12 in *N. J. S. A.* 54:4–52). The abstract is not required to be completed by the county board until April 10, and in the instant case was not filed prior to that date. These particular portions of the abstract appear, however, to have been known some time earlier. The comparative time tables for local and county board action, the details of which need not be gone into, make it quite possible that county board figures for the current year would not be available within the time a governing body must decide, after receipt of an estimate board's certificate, whether its concurrence is required. In that event, as the trial court suggested, 72 *N. J. Super.*, at *p.* 24, the county board figures for the previous year would have to be used.

"at its true value." *N. J. S. A.* 54:4–1. He files his completed assessment list with the County Board of Taxation by January 10 each year. *N. J. S. A.* 54:4–35. The county board is directed then to "revise, correct and equalize the assessed value of all property in the respective taxing districts, increase or decrease the assessed value of any property not valued at its true value, assess property omitted from any assessment, as provided by law, at its true value, and in general do everything necessary for the taxation of all property in the county at its taxable value." *N. J. S. A.* 54:4–47. Such changes are to be entered on the assessors' tax lists and the total for each municipality corrected accordingly. *N. J. S. A.* 54:4–48. The resulting figure becomes the "net valuation taxable" for each municipality inserted in column 7, so headed, in the table of aggregates previously referred to. *N. J. S. A.* 54:4–52(7). This is the $156,589,858 figure for Elizabeth in 1961 earlier mentioned, which we are advised actually represented the assessments originally filed by the city assessors revised by the county board only to correct clerical errors, if any.

Contemporaneously with the task just described, but as a different and separate process, the county board also must "ascertain and determine * * * the general ratio or percentage of full value at which the real property of each taxing district is assessed according to the tax lists laid before the board. It shall prepare an equalization table showing the assessed valuation of the real property in each district, the ratio or percentage, if any, by which the assessed valuation should be increased or decreased in order to correspond to true value, and the true value of the real property within the district as determined by it." *R. S.* 54:3–17. After hearing on and confirmation of the table, "the valuations of real property in each district as equalized shall be deemed to be the true valuation of such property in computing the total ratables of each district for all apportionments of county and State taxes, charges or distributions of moneys * * *." *R. S.* 54:3–19. See also *N. J. S. A.* 54:4–49. The resulting

figure becomes the "[n]et valuation on which county, State and State school taxes are apportioned" for each municipality, designated as item 12 in the statute providing for the table of aggregates. *N. J. S. A.* 54:4–52(12). (Since we presently have no State or State school taxes, the comparable column 11 in the form of the table now in use is designated as "net valuation on which county taxes are apportioned." Perhaps it might be more accurately called "apportionment valuation," the term prescribed in the amendment of *N. J. S. A.* 54:4–49 by *L. 1956, c. 93*). This is the $433,817,887 figure for Elizabeth in 1961 previously referred to.

In theory, a three step process is prescribed: one, assessment at the true value by the municipal assessor; two, correction and revision by the county board of the local assessments in each taxing district separately to assure that all property in each is assessed at true value and thereby to equalize the county and local tax burden as among individual property owners; and three, equalization of the total real property assessments in each district as so revised with those of every other district in the county for the purpose of assuring equality between districts with respect to burdens and benefits extending beyond the boundaries of a single municipality.

Of course, it has long been common knowledge that, before 1922 and since, the theory has not been practiced. See *e. g., City of Passaic v. Passaic County Board of Taxation,* 18 *N. J.* 371 (1955). Except where two or three counties have in very recent years most commendably required compliance with the law, assessors have not assessed at true value and county boards have not revised and corrected assessments within individual municipalities to reflect true value, as witness the case in Elizabeth in 1961. And until required by administrative action of the state taxing authorities about the middle of the last decade, there was no equalization at true value between districts undertaken by county boards, and so no equality even with respect to intermunicipal burdens.

It is obvious that the situation before us is not one which

concerns equality of tax burden between municipalities. The formula in *R. S.* 18 :6–53, here under interpretation, relates only to a standard by which the right to governing body participation in a Chapter 6 school budget within a single municipality is to be ascertained. And, somewhat conversely, although the trial court suggested to the contrary, 72 *N. J. Super.*, at *pp.* 19, 22, the selection of the equalization valuation figure as controlling would have no effect whatever on the tax base within the city since taxes for school appropriations and for all other municipal purposes would both be levied at the same total general tax rate applied to the same $156,589,858 figure of "net valuation taxable."

Without regard to the language of definition in *R. S.* 18 :6–53, this case differs basically from *Maplewood* (39 *N. J. Super.* 202) and *Berkeley Heights* (23 *N. J.* 276). In both of those situations the matter of equality of tax burden between more than one municipality was paramount. The first concerned the basis for apportionment of moneys to be raised by taxation for school purposes between the two-municipality members of what amounted to a consolidated school district and the second to a like problem with respect to a six-member regional high school district. The statute in *Maplewood* keyed the apportionment to "assessed valuation" and in *Berkeley Heights* to "ratables." The court in each case decided that the apportionment must be computed on the basis of the figures of equalization at true value promulgated by the county board as to each district involved (the cases arose after the state authorities had required such equalization by the county boards) rather than on the norm of assessments made by the local assessors. Since the general purpose of the prescribed apportionment was obviously to serve the purposes of fair distribution of costs and revenues as between municipalities sharing common burdens, the rationale was that the Legislature must be held to have intended a basis common to the affected municipalities to be used.

Again without regard to statutory language, the fundamental situation before us is akin to that in the *Park Com-*

*mission* case (58 *N. J. Super.* 93). There the problem was one of the meaning of a statutory standard prescribing the limits for annual appropriations by a county for park purposes. The statutory percentages were keyed to "assessed valuation of the taxables and ratables of the county." The matter, as in our case, was intramunicipal, so to speak, rather than intergovernmental and involved no question of equality of burden between different taxing units.

While it may be said that in these intragovernmental situations at least one legislative aim was to place all municipal corporations subject to the legislation in the county—or in the State for that matter—on the same footing, nonuniformity does not have the same impact, since there is no hurt to others, as in the case of nonequality in the intermunicipal burden cases. In most intragovernmental situations, such as the one at bar and the *Park Commission* case, lack of complete uniformity by reason of the use of unequalized assessments, made with varying percentages of true value, as the criterion makes only an unsubstantial difference. For example, according to column 9 of the 1961 Union County abstract of ratables, the assessors of Elizabeth asssessed at 32.79% of true value, while in the other three Chapter 6 school districts in the county the percentages were 23.57, 34.99 and 29.54. So we feel we cannot give controlling significance to the mere matter of intergovernmental uniformity in an intramunicipal situation like that before us, as desirable as that may be.

But the main thrust of plaintiffs' argument is that the particular language used in *R. S.* 18 :6–53—"the valuation of the assessable ratables * * * as determined by the county board of taxation"—is so much more specific and so different from that involved in the *Park Commission* case—"assessed valuation of the taxables and ratables"—that the Legislature must have intended the equalization valuation to be used.

The limitation, in other language, first appeared in the general school law of 1903, *L.* 1903 (2d Sp. Sess.) *c.* 1, § 75. There it read "any amount in excess of three-fourths of one per centum of the *taxable valuation of the real and personal*

*property.*" (Emphasis supplied) A standard in identical language, but with a 3% limitation, was contained in § 76 restricting the amount of bonded debt a Chapter 6 district could incur. Two amendments of § 75 by *L*. 1919, *c*. 1 and *L*. 1922, *c*. 243 did not change the quoted language. Then came *L*. 1922, *c*. 248, approved the same day as *c*. 243, amending the section in several particulars, including the change from "taxable valuation of the real and personal property" to the present form—"valuation of the assessable ratables * * * as determined by the county board of taxation." The statement of purpose annexed to the bill makes no mention of the change and we can find no extrinsic evidence of legislative intent or purpose at the time. For whatever it may be worth, the statement affixed to a later bill increasing the percentage from three-quarters of one per cent to one and one-half per cent, *L*. 1925, *c*. 236, recited that the purpose was to allow a Board of School Estimate "to fix and determine the amount for the annual school budget up to 1½% of *assessed valuation* instead of ¾% * * *." (Emphasis supplied) By way of comparison, it may be noted that the debt limitation section, which became *R. S*. 18:6–62, retained its 1903 language until *L*. 1952, *c*. 252, when the base to which the percentage was to be applied was amended to read "assessed valuations of the taxable real property (including improvements) of the municipality." See *N. J. S. A*. 18:5–88(k). Parenthetically, it may be said that there would seem little reason for legislative distinction between the criterion for action with respect to budget consent and that relating to debt limitation in the same school district.

Of course, the very fact of a change in language in 1922 suggests the Legislature intended something different by the amendment. The only intent we can divine is that of a change from a base figure determined by the valuations fixed by the local assessor (step one in the process previously described) before the revision thereof by the county board (step two in the process) to a base represented by the figure resulting from the county board's step two revision. In the

*Park Commission* case (58 *N. J. Super.* 92) the criterion of "assessed valuation of the taxables and ratables of the county" was spoken of as having reference to the assessors' unrevised valuations.

We are firmly convinced that the Legislature in 1922 did not intend to prescribe the standard of equalized valuations on a county-wide basis. Our reason for this conclusion is twofold. First, the sole purpose of such equalization then and now, even in theory, "is the apportionment to each taxing district of its fair share of the county tax burden * * *." (*Park Commission* case, 58 *N. J. Super.*, at *p*. 105) and should not be used as a yardstick for an unrelated purpose unless the legislative intent is clear beyond any doubt. Second, the Legislature must be held to have known that county equalization at true value was simply not even being attempted in 1922, see 58 *N. J. Super.*, at *p*. 101, and that the entry in the equalized valuation column in the county table of aggregates was no different in amount from that in the "net valuation taxable" column. We cannot assume that the Legislature intended something which it knew in practice would mean nothing.

We therefore conclude that the rationale of the *Park Commission* case (58 *N. J. Super.* 92) is applicable here and subscribe to the further reasons spelled out by Judge Goldmann in his opinion therein.[4] It is consequently not neces-

---

[4] We have not, of course, considered the effect of changes in the assessment process made by *L.* 1960, *c.* 51 (now effective in 1964, *N. J. S. A.* 54:4–2.34) on problems like the one here involved. We note, however, that *section* 39 of *c.* 51 (*N. J. S. A.* 54:4–2.35) expresses the legislative intention that all pertinent statutes be revised in order to reflect the policies embodied in the act, and directs the State Treasurer to prepare an analysis of the tax statutes requiring amendment, supplement or repeal to accomplish that purpose. We assume such a study will include all statutory requirements or limitations keyed to assessments, since state-wide uniformity therein is not only desirable but appears absolutely essential under the new assessment scheme. See the earlier comments of this court in *Switz v. Middletown Township*, 23 *N. J.* 580, 598 (1957). See also *Switz v. Kingsley*, 37 *N. J.* 566, 573–574 (1962).

sary to comment upon other considerations adverted to by the trial court or advanced by the parties here.

The judgment is affirmed, without costs.

SCHETTINO, J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.