ROSE DEITELBAUM MIMKON, PLAINTIFF-APPELLANT, v. DONALD FORD AND ADELE FORD, DEFENDANTS-RESPONDENTS.

Argued September 10, 1974—Decided February 6, 1975.

Mr. *Mark Vasser* argued the cause for plaintiff-appellant (*Messrs. Finn, Kendis, Vasser, Rimm & Bloom,* attorneys; *Mr. Vasser* on the brief).

Mr. *Gerard C. Gross* argued the cause for defendants-respondents( *Messrs. McGahn and Friss,* attorneys; *Mr. Gross* on the brief).

The opinion of the Court was delivered by

PASHMAN, J. Where the mother of a child is deceased, is the maternal grandmother of that child entitled to visit her by virtue of *N. J. S. A.* 9:2–7.1 when the natural father and his second wife, who has legally adopted the child, refuse to permit visitation? That is the question presented on this appeal.

Jill Ford was born to Joan and Donald Ford on July 2, 1966. The parents had separated prior to her birth. They were divorced on November 4, 1968. Thereafter, Jill resided with her mother and maternal grandmother, Rose Mimkon, the plaintiff herein. The mother died on November 24, 1970 whereupon Donald Ford took custody of his daughter and has since cared for her.

Defendants Donald and Adele Ford were married in June 1969. Thereafter, Adele adopted Jill on August 13, 1971 in New Jersey. The maternal grandmother visited Jill at the Ford residence until she was denied that right. She then instituted an action for visitation rights. On January 4, 1972, a judgment was entered denying that right.

On February 1, 1972, *N. J. S. A.* 9:2–7.1 became effective and provided:

Where either or both of the parents of a minor child, residing within this State, is or are deceased, a grandparent or the grandparents of such child, who is or are the parents of such deceased parent or parents, may apply to the Superior Court for a writ of habeas corpus to have such child brought before such court; and on the return thereof, the court may make such order or judgment, as the best interest of the child may require for visitation rights for such grandparent or grandparents in respect to such child.

In August 1972, plaintiff filed a new complaint resulting in a judgment entered in March 1973 permitting visitation with her grandchild during the first weekend of each month.

This was reversed by the Appellate Division. 125 *N. J. Super.* 420 (1973). We granted certification. 64 *N. J.* 490 (1974).

In matters involving custody and visitation the ultimate concern of our courts is always for the welfare of the infant. This is the controlling element. In the past where the child's welfare did not dictate otherwise, the grandparents had neither a right to custody nor to visitation as against a parent. This was the common law of New Jersey. *In re Goldfarb,* 6 *N. J. Super.* 543 (Ch. Div. 1949) ; *People ex rel. Marks v. Grenier,* 249 *App. Div.* 564, 293 *N. Y. S.* 364 (N. Y. App. Div. 1937), aff'd 274 *N. Y.* 613, 10 *N. E.* 2d 577 (N. Y. Ct. App. 1937) ; *cf. In re Alsdorf,* 142 *N. J. Eq.* 246, 253 (Ch. 1948). In those cases in which visitation was granted to a grandaparent, the decision was bottomed wholly upon a consideration of the child's welfare. At no time was there a judicial recognition of the existence of any right in the grandparent. *Starr v. Gorman,* 136 *N. J. Eq.* 105 (E. & A. 1945). The courts have been substantially unanimous in denying a grandparent visitation privileges with grandchildren when the custodial parent objects. This is true in Texas (*Green v. Green,* 485 *S. W.* 2d 941 (Tex. Ct. Civ. App. 1972), writ ref'd n. r. e.) ; Arkansas (*Veazey v. Stewart,* 251 *Ark.* 334, 472 *S. W.* 2d 102 (Ark. Sup. Ct. 1971)) ; California (*Odell v. Lutz,* 78 Cal. App. 2d 104, 177 *P.* 2d 628 (Cal. Dist. Ct. App. 1947)) ; District of Columbia (*Jackson v. Fitzgerald,* 185 *A.* 2d 724 (D. C. Mun. Ct. App. 1962)) ; Louisiana (*Succession of Reiss,* 46 La. Ann. 347, 15 *So.* 151 (La. 1894)) ; New York (*People ex rel. Sisson v. Sisson,* 271 *N. Y.* 285, 2 *N. E.* 2d 660 (N. Y. Ct. App. 1936), *Noll v. Noll,* 277 *App. Div.* 286, 98 *N. Y. S.* 2d 938 (N. Y. App. Div. 1950)) ; Ohio (*Kay v. Kay,* 51 *Ohio Op.* 434, 112 *N. E.* 2d 562 (Ohio Ct. C. P. Cuyahoga Co., 1953)), and Pennsylvania (*Commonwealth ex rel. McDonald v. Smith,* 170 *Pa. Super.* 254, 85 *A.* 2d 686 (Pa. Super. Ct. 1952), *Commonwealth ex rel. Flannery v. Sharp,* 151 *Pa. Super.* 612, 30 *A.* 2d 810 (Pa.

Super. Ct. 1943)). In reviewing the cases from the various jurisdictions, and not considering statutory enactments, there appear to be five basic reasons relied upon for the denial of judicially enforced grandparent visitation rights, which have been summarized as follows:

(1) Ordinarily the parent's obligation to allow the grandparent to visit the child is moral, and not legal. [*E. g., Succession of Reiss, supra* (15 So.) at 152; *Smith v. Painter,* 408 *S. W.* 2d 785, 786 (Tex. Ct. Civ. App. 1966), writ ref'd n.r.e., 412 *S. W.* 2d 28 (Tex. Sup. Ct. 1967)].

(2) The judicial enforcement of grandparent visitation rights would divide proper parental authority, thereby hindering it. [*E. g., Odell v. Lutz, supra* (177 P. 2d) at 629; *Jackson v. Fitzgerald, supra* (185 A. 2d) at 726].

(3) The best interests of the child are not furthered by forcing the child into the midst of a conflict of authority and ill feelings between the parent and grandparent. [*E. g., Noll v. Noll, supra,* 98 *N. Y. S.* 2d at 940; *Commonwealth ex rel. Flannery v. Sharp, supra,* 30 *A.* 2d at 812].

(4) Where there is a conflict as between grandparent and parent, the parent alone should be the judge, without having to account to anyone for the motives in denying the grandparent visitation. [*E. g., Odell v. Lutz, supra* (177 P. 2d) at 629; *Succession of Reiss, supra* (15 So.) at 152].

(5) The ties of nature are the only efficacious means of restoring normal family relations and not the coercive measures which follow judicial intervention. [*E. g., Succession of Reiss, supra* (15 So.) at 152; *Commonwealth ex rel. Flannery v. Sharp, supra,* 30 *A.* 2d at 812].

[Gault, "Statutory Grandparent Visitation," 5 *St. Mary's L. J.* 474, 480–81 (1973)].

■ *N. J. S. A.* 9:2–7.1, providing for visitation when a parent has died, changes the common law rule as to the right of grandparents.[1] The statute creates an independent

---

[1]Grandparent visitation rights were further expanded by virtue of an amendment to *N. J. S. A.* 9:2–7.1, effective May 2, 1973:

Where either or both of the parents of a minor child, residing within this State, is or are deceased, or divorced or living separate and apart in different habitats, regardless of the existence of a court order or agreement, a grandparent or the grandparents of such child, who is or are the parents of such deceased, separated

action in the grandparent. In no way does the right asserted by plaintiff depend on continued relations through the deceased daughter. If Donald Ford, the natural father, after taking custody of the child, had remarried without subsequent adoption by the stepmother, or did not remarry, and the trial judge found as a fact that visitation by plaintiff grandmother would redound to the child's best interest, as he did in this case, the visitation statute would plainly be applicable and call for the provision of visitation rights to plaintiff.

The factual pattern actually presented, however, includes the adoption of Jill by her stepmother, thereby requiring the consideration of possible conflicting policies embodied in *N. J. S. A.* 9:3–17 *et seq.* as amended in 1953. The pertinent sections of that statute provide:

9:3–17    This act shall be administered so as to give effect to the public policy of this State to provide for the welfare of children requiring placement for adoption and so as to promote policies and procedures which are socially necessary and desirable for the protection of such children, their natural parents and their adopting parents. To that end, it is necessary and desirable.

\*    \*    \*

(c) to protect the adopting parents \* \* \* from later disturbance of their relationships to the child by the natural parents.

9:3–30    (A) The entry of a judgment of adoption shall terminate all relationships between the child and his parents, and shall terminate all rights, duties, and obligations of any person which are founded upon such relationships, including rights of inheritance under the intestate laws of this State; *provided, however*, that when the adopting parent is a stepfather or stepmother, and the adoption is consummated with

---

or divorced parent or parents, may apply to the Superior Court, in accordance with the Rules of Court, to have such child brought before such court; and the court may make such order or judgment, as the best interest of the child may require, for visitation rights for such grandparent or grandparents in respect to such child.

The right of visitation was therefore granted not only where one or both natural parents are deceased but also where the parents are divorced or living separate and apart in different homes and regardless of an existing court order or agreement.

the consent and approval of the mother or father, respectively, such adoption shall not affect or terminate any relationships between the child and such mother or father, nor the rights of inheritance under the intestate laws of this State through the other parent.

Do the provisions of the adoption statute override the visitation statute? The Appellate Division held that after adoption, the adopting parents, relying on *N. J. S. A.* 9:3–30(A), may refuse to permit a grandparent to visit with a grandchild despite the visitation statute.[2] We disagree with the Appellate Division's interpretation of *N. J. S. A.* 9:2–7.1 and *N. J. S. A.* 9:3–17 et seq.

■ Both statutes seek to provide substitute parental relationships for children who, for some reason, have been deprived of the benefits of a healthy relationship with one or both natural parents. As statutes which deal with the same matter or subject, *Clifton v. Passaic Cty. Bd. of Taxation,* 28 *N. J.* 411, 421 (1958), and which seek to achieve the same overall legislative purpose, *Gualano v. Bd. of School Estimate of Elizabeth School Dist.,* 72 *N. J. Super.* 7, 23 (Law Div. 1962), aff'd 39 *N. J.* 300 (1963), they should and must be read *in pari materia.* 2A *Sutherland, Statutory Construction* (Sands ed. 1973), § 51.03 at 298. This rule of statutory construction derives from the reasonable presumption that legislators are aware of relevant prior legislation. *State v. Federanko,* 26 *N. J.* 119, 129 (1958).

The guiding principle * * * is that if it is natural and reasonable to think that members of the legislature * * * would think about another statute and have their impressions derived from it influence their understanding of the act whose effect is in question; then a court called upon to construe the act in question should also allow its understanding of it to be influenced by impressions derived from

---

[2] It is, perhaps, more accurate to say that the effect of the Appellate Division holding is that after adoption, the stepmother alone may refuse visitation by a grandparent. Her husband cannot invoke *N. J. S. A.* 9:3–30(A) because he is not an adopting parent.

the other statute. [2A *Sutherland, Statutory Construction* (Sands ed. 1973), § 51.03 at 298–99].

While the rule most obviously applies when the statutes in question were enacted during the same session or went into effect at the same time, *Fried v. Kervick,* 34 *N. J.* 68, 70–71 (1961); *State v. Wasserman,* 75 *N. J. Super.* 480, 487–488 (App. Div. 1962), aff'd 39 *N. J.* 516 (1963), or where they make specific reference to one another, 2A *Sutherland, Statutory Construction* (Sands ed. 1973), § 51.03 at 299, it may appropriately be applied even when the statutes were adopted at different times and make no reference to each other. *In re Book,* 90 *N. J. Eq.* 549, 552–553 (E. & A. 1919); *see State v. Green,* 62 *N. J.* 547 (1973).

As we noted in *In re Adoption of The Children of D.,* 61 *N. J.* 89, 92 (1972), *N. J. S. A.* 9:3–17 *et seq.* is principally concerned with adoptions by persons other than relatives of children "placed for adoption" because their parents are unwilling or unable to care for them. *Cf. State v. Wasserman,* 75 *N. J. Super.* 480 (App. Div. 1962), aff'd 39 *N. J.* 516 (1963). In that context defendants' contention that the adoption statute was intended to protect the relationship between the adopted child and the adopting parents from interference by the natural parents is undeniably sound. *N. J. S. A.* 9:3–17(c). The natural parents caused the child to be placed in a position of adoptability; they can be most detrimental to the child's well-being if permitted to interfere in the adoptive home. That is why the judgment of adoption terminates all relationships between the child and his natural parents. *N. J. S. A.* 9:3–30(A).

The case before us, however, presents an entirely different situation — one which, perhaps, is far less common — that of a child born to parents later divorced, custody in the naural mother until death and then custody in the father, remarriage of the father, and an application by his new wife to adopt the child. This is not a case in which the child was "placed for adoption" by strangers, nor did the adoption

involve transfer of physical custody of the child. In such a case, outside the zone of primary concern of the Legislature in enacting *N. J. S. A.* 9:3–17 *et seq.,* the policy of insulating the adoptive child from his natural parents is not so clearly compelling as it would be in other situations.

There is no evidence in the record to indicate that Joan Ford was anything but a loving and fit parent prior to her death. The burden of establishing that a divorced natural parent has "forsaken [his] parental obligations," pursuant to *N. J. S. A.* 9:3–24(C), is substantial, *In re the Adoption of The Children of D.,* 61 *N. J.* 89 (1972), and we have no reason to believe that the trial court would have ordered the adoption over Joan's protest had she still been alive. Thus, we are not dealing with a case in which the physical well-being of the adopted child or his relationship with his adoptive parents may be threatened by the meddling of a parent who has been adjudicated unfit to raise the child.[3]

Furthermore, it is a natural grandparent rather than a natural parent who is seeking visitation here. Interference by a natural parent with the relationship between the child and the adopting parents introduces alternative and conflicting authority figures in the child's life, creating tremendous emotional tension in the child and ultimately threatening to undermine the authority of the adoptive parents and

---

[3]This is not to say that a grandparent would categorically be deprived of any rights to visitation by the fact that the deceased parent had so disregarded his parental obligations prior to his death that a court would have found that he had "forsaken his parental obligations" pursuant to *N. J. S. A.* 9:3–24(C) or *N. J. S. A.* 9:2–19 had the question been raised in a proper proceeding. The conduct of the deceased parent may or may not have a bearing on whether visitation by the grandparent is in the best interests of the child. That is a matter which must be determined by the trial judge on the specific facts in each case.

On the other hand, nothing in this opinion is intended to suggest that the grandparent could invoke the visitation statute after the child of the grandparent has in fact been adjudicated to have "forsaken his parental obligations" and adoption ordered. In that case the policy of *N. J. S. A.* 9:3–17(c), 30, subd. A plainly controls.

their ability to make parental decisions. Grandparents ordinarily play a very different role in the child's life; they are not authority figures and do not possessively assert exclusive rights to make parental decisions. At best, they are generous sources of unconditional love and acceptance, which complements rather than conflicts with the roles of the parents.

Thus, grandparent visitation involves a much lesser risk of threat to the physical or psychological well-being of the child or to the development of a healthy and natural relationship between the child and the adopting parents than might continued contact by the natural parent. To this extent, grandparent visitation, in the context of the facts of this case, does not clash with the policies apparently embodied in the adoption statute.

As enacted in 1971, *N. J. S. A.* 9:2–7.1 spoke exclusively to the situation in which one or both natural parents had died. The Legislature must have contemplated the possibility that a surviving natural parent, responding to the bad feeling that occasionally arises among in-laws, might object to continued contact with the child by the parents of the deceased spouse or that he or she might remarry and the new stepparent object to what might seem to be encroachment upon his or her parental position by the parents of the deceased spouse. It was this very possibility which necessitated the enactment of the statute. The fact that the surviving natural parent and his or her new spouse give legal color to their objections by adopting the child and invoking *N. J. S. A.* 9:3–17(c), 30, subd. A should not be permitted to subvert the purposes of the Legislature in enacting *N. J. S. A.* 9:2–7.1. We do not believe that the Legislature intended to permit the statutorily granted right of visitation by grandparents to be frustrated by the otherwise wholly beneficent policies of the adoption statute.[4]

---

4Plaintiff suggests that a legislative intention that natural grandparents be permitted to visit their grandchildren after adoption can be inferred from the fact that the grandparent visitation statute as

It is biological fact that grandparents are bound to their grandchildren by the unbreakable links of heredity. It is common human experience that the concern and interest grandparents take in the welfare of their grandchildren far exceeds anything explicable in purely biological terms. A very special relationship often arises and continues between grandparents and grandchildren. The tensions and conflicts which commonly mar relations between parents and children are often absent between those very same parents and their grandchildren. Visits with a grandparent are often a precious part of a child's experience and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. Neither the Legislature nor this Court is blind to human truths which grandparents and grandchildren have always known.

■ In view of this, we can only say that it is proper that in the unfortunate case of parental separation or death, grandparents should sometimes have privileges of visitation even over the objections of the adoptive parents. It is not only the ordinary devotion to the grandchild that merits the grandparent's continued right to be with him, but also the fact that in such cases, the continuous love and attention of a grandparent may mitigate the feelings of guilt or rejection, which a child may feel at the death of or separation from a parent, and ease the painful transition.

■ It should be noted that N. J .S. A. 9 :2–7.1 places the decison to grant or deny an order permitting visitation by a grandparent or to place conditions on such visitation in the discretion of the trial judge. Where the grandchild has been

enacted in 1971 did not include a provision found in the Assembly version of the bill which would specifically have excluded grandparent visitation when the child had been adopted. *Assembly Bill* No. 1191, 195th Sess. (passed Assembly December 6, 1971). While this clearly indicates that the Legislature had within its contemplation the problems raised in this case, we agree with the Appellate Division below that no such inferences can properly be drawn from this legislative history. 125 *N. J. Super.* at 424.

adopted, it is proper, in considering the effect of a visitation order on the well-being of the child, to take into account the possibility that visitation by a particular grandparent might undermine the authority of the adoptive parents or otherwise create psychological conflict in the child. The policies underlying the adoption statute, although not categorically overriding those of the grandparent visitation statute, are to be taken into account in the exercise of judicial discretion in this area.

The trial court below found after a full hearing, that initial visitation by plaintiff, with specified restrictions, for one hour each month, would be in the best interests of the child. We note that this order, like all orders concerning custody and visitation, is subject to modification at any time on showing of changed circumstances, cf. *Sheehan v. Sheehan,* 51 *N. J. Super.* 276, 287 (App. Div. 1958), certif. denied 28 *N. J.* 147 (1958), even though *N. J. S. A.* 9:2-7.1 does not explicitly provide. *Fantony v. Fantony,* 21 *N. J.* 525, 535 (1956). In fact, the judge stated that he would, on proper notice, review the visitation order after 12 months which period was needed to further observe the relationship. This time has passed.

A hearing should now be undertaken as to whether or not, at the present time and as circumstances now exist, it would be in the child's best interests to enter an order for continued visitation. For such purpose, the matter is remanded to the trial court.

The Appellate Division recognized, quite properly, the delicacy of the situation, but its judgment must be reversed and the judgment of the trial judge reinstated.

Reversed and remanded.

SULLIVAN, J. (concurring). I agree that the provisions of the adoption act do not "override" the grandparent visitation statute. However, I feel that the majority opinion places too much emphasis on the visitation rights a grandparent has under the statute, and it does not adequately in-

dicate that the child's best interest always comes first. Moreover, I question whether, on the evidentiary record of this case, the order for visitation was in the child's best interest, or, at least, whether reinstatement of the order at the present time may not work grievous harm on the child and the family unit of which she is a part.

Here the trial judge ordered that plaintiff have visitation over the objections of the child, as well as the child's father and adoptive mother who felt that plaintiff has been a disruptive influence in their family unit. The record indicates that the court-ordered attempts to give plaintiff visitation with the child have not only failed, but have had an adverse physical and emotional impact on the child herself. It may be that the child has been conditioned against her grandmother. If so, this is to be regretted, but if nurturing the relationship between grandparent and grandchild is to be had at the expense of the child's well-being and the family unit in which she now lives, I would have no doubt as to what a court should do.

The majority opinion, after affirming the ruling of the trial court on the issue of statutory construction, remands the matter to the trial court to hold a hearing as to whether or not at the present time and as circumstances now exist it would be in the child's best interests to enter an order for continued visitation. I agree with the remand and the necessity for a hearing, but would require that it be held within the framework of what I have said above. In this regard, the trial court should interview the child to ascertain, if possible, her feelings in the matter. If the child continues to oppose visitation by her grandmother, the court should try to have the child articulate her reasons. All of this should then be made a part of the record.

CLIFFORD, J. (dissenting). Because I think the legislature could not have intended *N. J. S. A.* 9:2–7.1 to apply to the situation before us, namely, death of the natural mother and remarriage of the father followed by adoption of his child by the new spouse, I would deny the visitation priv-

ilege sought by the grandmother here over the parents' objection.

I take the common law of New Jersey to be as set forth in *In re Goldfarb,* 6 *N. J. Super.* 543, 547 (Ch. Div. 1949):

In those cases in which visitation has been granted to a grandparent, the result has been based entirely upon a consideration of the welfare of the child without judicial recognition of the existence of any right in the grandparent.

As I understand the statute here under consideration, it does not change that common law. Rather, it addresses the situation set forth in the following dictum from Goldfarb:

In a contest between a surviving parent and the grandparents on the deceased parent's side, one can readily understand that circumstances could justify the conclusion that the best interests of the child require visitation with the grandparents. [*Id.* at 547–548].

In the first circumstance[1] contemplated by the statute — "either or both of the [natural] parents * * * is or are deceased * * *" — the court can consider a grant of visitation privileges to the deceased parent's parent "as the best interest of the child may require."

But that is not our case, and we are faced with entirely different considerations. Again from *Goldfarb*:

But where the surviving parent remarries and the new spouse adopts the infant, thereby establishing a new family relation for the child, a very different situation is presented. The duty and right to determine how the child shall be raised rest with the parents. A court may not interfere merely because it possesses a different conception as to how to rear the child or what social relationships should be fostered or maintained. [*Id.* at 548].

I would conclude that upon the adoption of Jill by defendant Donald Ford's second wife, Adele, the infant there-

---

[1] I intimate no view in this opinion with respect to application of *N. J. S. A.* 9:2–7.1 when the other circumstances to which it is addressed prevail, *i. e.,* where the parents are "divorced or living separate and apart in different habitats * * *."

upon had two "parents" in every significant sense of the word. Therefore, the first condition precedent for triggering the statute no longer existed and an action thereunder could not lie.

A holding which does not recognize that at the time of this suit Jill had two parents not only ignores or stretches the language of the statute but, more distressingly, relegates an adopting parent to "second-class" status. In my view Adele Ford is for every purpose and from every perspective and in any terms save blood as much the maternal parent to the child as is any other mother to her daughter. See *Rosier v. Fischer,* 2 *N. J. Misc.* 499 (Ch. 1924) ; *State ex rel. Herman v. Lebovits,* 66 *Misc.* 2d 830, 322 *N. Y. S.* 2d 123 (Sup. Ct. 1971). *But cf. Roquemore v. Roquemore,* 275 *Cal. App.* 2d 912, 80 *Cal. Rptr.* 432 (Ct. App. 1969) ; *Scranton v. Hutter,* 40 *A. D.* 2d 296, 339 *N. Y. S.* 2d 708 (App. Div. 1973). Any other perception of the relationship strains the cohesion binding husband and wife with their child. Their decisions as to how they choose to raise that child should not be tampered with by so tenuous an interpretation of the statute as to transform it into an invitation for a court's intrusion in the circumstances presented here.

The tragedy visited upon a child by the death of a natural parent is too obvious to call for further expression here. Remarriage and adoption are wholesome steps toward reunification of a family unit broken by the unhappy event of death. Enforcing grandparental visitation over the parents' objection in the circumstances before us can only frustrate defendants' good-faith efforts to reconstruct the family and to bring stability into the daughter's life. Given the objection to visitation — be it well-taken or otherwise — I forsee continued acrimony between the parties and a tug-of-war with Jill in the middle. *Compare* my dissenting opinion in *Small v. Rockfeld,* 66 *N. J.* 231 (1974). Judicial interference in this sensitive area should generally be un-

dertaken only with the greatest hesitancy and in this case not at all.

HALL and SULLIVAN, JJ., concur in the result.

*For reversal and remandment*—Chief Justice HUGHES, and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN and PASHMAN—6.

*For affirmance*—Justice CLIFFORD—1.