4 A.3d 1004 (2010)
203 N.J. 545
In the Matter of D.C. and D.C., Minors.
A-71 September Term 2009.
Supreme Court of New Jersey.
Argued April 26, 2010.
Decided September 29, 2010.
*1006 Jeyanthi C. Rajaraman argued the cause for appellant (Legal Services of New Jersey, Melville D. Miller, Jr., President, attorney; Mr. Miller, Ms. Rajaraman, and Mary McManus-Smith on the briefs).
Andrea M. Silkowitz, Assistant Attorney General, argued the cause for respondent Division of Youth and Family Services (Paula T. Dow, Attorney General, attorney).
Olivia Belfatto Crisp, Assistant Deputy Public Defender, argued the cause for respondents D.C. and D.C. (Yvonne Smith Segars, Public Defender, Law Guardian, attorney).
Cecilia M. Zalkind, Newark, and Mary E. Coogan submitted a brief amicus curiae on behalf of Association for Children of New Jersey.
Catherine Weiss submitted a brief amici curiae on behalf of Foster Care Alumni of America and Child Advocacy Clinic at Rutgers School of Law-Newark (Lowenstein Sandler, attorneys; Ms. Weiss and Kenneth H. Zimmerman of counsel; Ms. Weiss, Carl M. Greenfeld, Sarah Blaine, Rebecca B. Visvader, and Kelly A. Lloyd, Roseland, on the brief).
Justice LONG delivered the opinion of the Court.
We are here faced with a case involving five-year-old twins who were removed from their mother's custody by the Division of Youth and Family Services (the Division or DYFS) and placed in foster care. Ultimately, the mother's parental rights were terminated. In the interim, the twins' siblings applied for custody and visitation. Some visits occurred. When the siblings were ruled out as potential *1007 custodians and the foster mother[1] (who had been approved to adopt the twins) balked at continuing contact, visitation was terminated. The trial judge refused to intervene and the Appellate Division, over a dissent, affirmed. With the adoption pending, the siblings now seek to continue contact with the twins in this interim period and after the adoption is finalized.
Thus, we are asked to consider the standards applicable to the siblings' request for visitation during two different time frames: after placement but prior to adoption, and after adoption. We hold, in accordance with the principles in the Child Placement Bill of Rights Act, N.J.S.A. 9:6B-1 to -6, that visitation between siblings placed outside the home is presumed in the period between placement and adoption, and that the Division has an independent obligation during that period to facilitate such visitation. If the Division opposes visitation for any reason, it bears the burden of overcoming the presumption and proving under the standards in the Child Placement Bill of Rights Act that such visitation is contrary to the child's welfare.
The post-adoption setting presents different considerations. Our law recognizes the family as a bastion of autonomous privacy in which parents, presumed to act in the best interests of their children, are afforded self-determination over how those children are raised. All of the attributes of a biological family are applicable in the case of adoption; adoptive parents are free, within the same limits as biological parents, to raise their children as they see fit, including choices regarding religion, education, and association. However, the right to parental autonomy is not absolute, and a biological family may be ordered to permit third-party visitation, over its objections, where it is necessary under the exercise of our parens patriae jurisdiction to avoid harm to the child. That principle governs adoptive families as well. Because the courts below appeared to believe incorrectly that the authority of the Division and the pre-adoptive family to deny sibling visitation is absolute, and acted accordingly, we now reverse and remand.

I.
In June 2005, Nina Carson[2] gave birth to the twin daughters, Dana and Donna, who are the subject of this action. They are presently in foster care awaiting adoption by their foster mother. Ms. Carson is also the biological mother of five other children, one of whom is deceased. The surviving children are Nellie Jackson, born in 1982, who appeals on her own behalf and on behalf of her minor sibling Hugo; Hugo, born in 1991, who currently lives with Nellie; Robert, a son who was removed from Ms. Carson's care and resides with his biological father; and Donald, born in 2008 during the pendency of these proceedings.[3]
In 2005 Ms. Carson moved from Virginia to New Jersey. One month later, in August 2005, after investigating a claim of abuse in Carson's home, the Division effected an emergency removal of the then three-month-old twins and of Hugo, then thirteen years old. The twins were placed in their current foster home in September 2005. Hugo was placed in a group home. Thereafter, the Division sought termination *1008 of Carson's parental rights as to the twins only.
At a hearing in January 2006, Carson provided a Division worker with the names of relatives to be considered as possible candidates for kinship placement, including Nellie. In February 2006, Nellie, residing in Virginia, asked to be assessed by the Richmond City Department of Social Services (RDSS) for placement of Hugo and the twins. After conducting a home study, RDSS reported that Nellie, then twenty-four years old, was "personable" and "mature for her age" and approved her as a "viable resource for the children." RDSS recommended that Hugo be placed with Nellie first, as he required specific services that Nellie would have to arrange.
In a quarterly report submitted in March 2007, an RDSS social worker observed that Nellie had moved to a non-RDSS-approved, two-bedroom apartment and that Nellie's common-law aunt was residing with her and was helping her care for Hugo. The report indicated that the aunt would have to be approved as a resident in the home and that, because Nellie planned to move to a four-bedroom apartment shortly, that apartment would require a new assessment. In the meantime, RDSS would not recommend placement of the twins with Nellie until her home was approved and a background check was completed on her and her aunt.
In March and April 2007, the Division discussed visitation of the twins with Nellie and Hugo. Nellie, citing her schedule and Hugo's upcoming state exams, noted that she was available on weekends and that Hugo wanted to visit the twins as well. The first visit occurred in July 2007 for a six-hour period, at which time the DYFS worker noted that Nellie seemed "very attentive" and "knowledgeable about caring for the children[,]" that Hugo was "very helpful and affectionate with the girls[,]" and that the twins seemed happy with the visit.
In April 2007, Nellie moved to a new three-bedroom home, in which only she and Hugo resided. RDSS approved placement of the twins with Nellie in August 2007, but expressed concerns about Nellie's financial ability to support the children, recommending that the Division arrange visitation prior to placement to ease the transition. RDSS approval of placement was effective from August 27, 2007, through August 31, 2009. However, in a December 2007 quarterly progress report, RDSS rescinded its recommendation to place the twins with Nellie, citing Hugo's poor grades and Nellie's "lack of involvement in Hugo's education." Nellie had also lost her job and was working part-time, leading to further concerns about her finances.
Ms. Carson's parental rights were terminated in December 2007; that decision was affirmed by the Appellate Division. We later denied certification. N.J. Div. of Youth & Family Servs. v. N.C., 199 N.J. 517, 973 A.2d 385 (2009).
In January 2008, the Division approved Nellie as a kinship legal guardian of Hugo, but informed her that she had not been approved for kinship placement of the twins and that her visitation with the twins would be terminated. A final visit was arranged for March 2008.
On April 3, 2008, Nellie filed an action in Superior Court seeking placement of the twins in her care. In those proceedings, Nellie certified that she had attempted to keep in contact with the twins but that Carson, angry about the removal of the children from her custody, refused to tell her anything about them or their placement, and that despite her repeated efforts, the Division likewise declined to give her such information. In support of custody, *1009 she cited the Commonwealth of Virginia's original approval of her for placement and the award of kinship legal guardianship of her brother, noted the recent approval by the State of New York for the placement of a newborn sibling in her care, and argued that placement of the twins with her would allow the children to remain as a sibling group. Moreover, she certified that after the Commonwealth of Virginia rejected her apartment for the twins' placement, she moved into a new apartment and made several unsuccessful attempts to contact RDSS, as well as the Division, for a new assessment. Finally, Nellie claimed that she was "willing and fully committed to caring for [her] sisters."
In the alternative, Nellie sought reestablishment of visitation with the twins every other Saturday for a six-hour period to assist in developing the sibling relationship, maintaining that such visitation would facilitate the reevaluation of her petition for custody.
In opposition, the Division relied on the passage of time and on its bonding evaluation, conducted in 2007, which identified the "presence of a strong positive emotional bond between the twins ... and their foster mother[.]" A report issued by the Court-Appointed Special Advocate (CASA) in May 2008 stated that the twins continued to be happy in their foster home, and that the foster mother sought to adopt them and move to Puerto Rico. The report indicated that although placement with Nellie was the original plan for the twins, the Division had eliminated her from consideration after the December 2007 interim report rescinded RDSS's original recommendation. No bonding evaluation of Nellie, Hugo, and the twins ever took place.
In preparation for the court proceeding, CASA conferred with the RDSS worker, who clarified that her 2007 report was never intended to rule out Nellie as a permanent option, but rather to raise concerns about transferring the twins to her care at that point. CASA stated that, although the twins were very fond of their foster mother, "they are very friendly and seem to adjust well to new surroundings"; that visitations, despite having gone well, had stopped when Nellie was rejected as a placement candidate; and that, because the Division had not facilitated visitation between Nellie and the twins, it was difficult to recommend the best placement option for them. CASA further noted that Nellie had only been unemployed for one month and had worked part-time in the meantime; that Hugo had a history of poor academic performance but that his behavior had greatly improved since being placed in his sister's care; and that Nellie had appealed her rejection as a placement candidate.
At a hearing on Nellie's application in June 2008, while acknowledging that "the courts of New Jersey are certainly always interested in having children placed with relatives and particularly with siblings[,]" the trial judge held that the twins should remain with the foster mother, citing their special needs.[4] At that point, the foster mother was agreeable to visitation. Thus, the judge allowed Nellie continued visitation, stating that "if the relationships can be kept ... it's always in [the children's] best interest[,]" but refrained from providing specific visitation instructions, instead asking that Nellie and the foster mother cooperate to make arrangements and relieved *1010 the Division of any obligation to facilitate, supervise, or fund visitation.
One month later, in July 2008, Nellie was advised by the Division that the foster mother was "no longer willing to facilitate visits between [Nellie] and the children." In August 2008, Nellie filed a motion to enforce litigants' rights based on the June 2008 order permitting visitation. At an October 2008 hearing, the judge noted that Ms. Carson's parental rights had been terminated and that the best interests of the children "trumped" any rights that Nellie had as a sibling, concluding that she was not in a position to re-litigate the plan of the Division, which remained foster home adoption. The judge expressed a strong belief "that some biological connection should remain with [the] children," but opined that she could not order the foster mother to permit visitation and, therefore, merely was "asking if [she] will please do this," again issuing an order allowing visitation at the foster mother's discretion. The judge "suggest[ed]" that CASA be involved in the visitation arrangements.
The Appellate Division affirmed, stating that only the issue of visitation had been properly appealed, and declined to address Nellie's contentions regarding the approval of the twins' adoption by the foster mother. Noting that legal guardianship of the twins rested in the Division when Nellie filed her motion, the panel held that it was the Division's responsibility to determine whether the visitation sought by Nellie was in the twins' best interests. The panel found that the Division had not "acted to interrupt or sever an existing [sibling] relationship" between Nellie and the twins, as no such relationship existed and that Nellie had presented no evidence that visitation was in the best interests of the twins.
The dissenting member of the panel stated that the facts as reported by the Division, RDSS, and Nellie were "divergent" and that an evidentiary hearing should have been held to resolve those outstanding issues. She further contended that the Division appeared to be responsible for the delay in permanent placement, which in turn resulted in the bonding between the foster mother and the twins, effectively vesting in the foster mother the right to determine visitation.
An adoption hearing was scheduled. The Appellate Division stayed that hearing pending its decision. That stay was dissolved in the court's opinion affirming the trial judge's order. However, in September 2009, we granted Nellie's motion to further stay the adoption proceedings pending her challenge to the panel's decision. Thereafter, Nellie abandoned her custody quest, and DYFS filed a motion to vacate the order staying the adoption. We have granted that motion effective upon the filing of this opinion.
Nellie petitioned this Court for certification in connection with the Appellate Division's decision denying visitation. We granted the petition, 201 N.J. 273, 989 A.2d 1265 (2010), and now reverse.

II.
Nellie argues that material facts regarding the best interests of the twins are still in dispute and that the trial judge therefore abused her discretion in failing to conduct an evidentiary hearing regarding her request for visitation. She further maintains that the judge ignored the State's strong public policy favoring sibling visitation.
Amici Foster Care Alumni of America and the Child Advocacy Clinic at Rutgers School of Law-Newark support Nellie's arguments, citing case law and social science research favoring sibling visitation and emphasizing that the significance of *1011 sibling relationships is even greater for children who have been removed from parental care.
The Division counters that when parental rights are terminated, its authority over the custody and visitation of the children is absolute and not subject to second-guessing by the court; that Nellie's own lack of involvement led the Division to "consent to the adoption of the twins by the foster [mother]"; that visitation is not in the best interests of the twins; and that the twins' right to the permanency that adoption by their foster mother will provide trumps any sibling rights raised by Nellie. The Law Guardian supports the Division's contentions, arguing that there is no right to sibling visitation after the termination of parental rights.
Amicus Association for Children of New Jersey (ACNJ) argues that sibling visitation should be encouraged by voluntary agreement, not mandated by court order, and that the protection of sibling relationships provided by the Child Placement Bill of Rights Act does not apply in a post-adoptive setting because adoptive parents have a fundamental right to make decisions regarding the upbringing of their children. ACNJ further claims that mandating post-adoption visitation will create logistical issues regarding enforcement.

III.
Although this case involves sibling visitation, some historical background regarding third-party visitation generally is required to place the issue in perspective.

A.
At common law, third parties had no right to petition for visitation with children. Moriarty v. Bradt, 177 N.J. 84, 95, 827 A.2d 203 (2003), cert. denied, 540 U.S. 1177, 124 S.Ct. 1408, 158 L.Ed.2d 78 (2004); Mimkon v. Ford, 66 N.J. 426, 430, 332 A.2d 199 (1975). That position flowed from the social science research of the day, which was "guided by emphasis on the `isolated nuclear family.'" Moriarty, supra, 177 N.J. at 96, 827 A.2d 203 (citation omitted). Indeed, visitation was viewed as entirely a parental right, part of the cluster of rights associated with parental status. Ayelet Blecher-Prigat, Rethinking Visitation: From a Parental to a Relational Right, 16 Duke J. Gender L. & Pol'y 1, 2 (2009).
The tide began to turn when social scientists suggested emphatically that the relationship between children and their grandparents is an important and unique one with significant emotional implications.
The emotional attachments between grandparents and grandchildren have been described as unique in that the relationship is exempt from the psycho-emotional intensity and responsibility that exists in parent/child relationships. The love, nurturance, and acceptance which grandchildren have found in the grandparent/grandchild relationship "confers a natural form of social immunity on children that they cannot get from any other person or institution." [Moriarty, supra, 177 N.J. at 97, 827 A.2d 203 (quoting Chrystal C. Ramirez Barranti, The Grandparent/Grandchild Relationship: Family Resource in an Era of Voluntary Bonds, 34 Fam. Rel. 343, 346 (1985) (citing Arthur Kornhaber, M.D. & Kenneth L. Woodward, Grandparents/Grandchildren: The Vital Connection, xiii-xiv (1981))).]
Indeed, commentators have suggested that "when an individual does not have intergenerational family relationships there is a resulting lack of cultural and historical sense of self." Moriarty, supra, 177 N.J. at 97, 827 A.2d 203 (citation omitted). As a result of that refocus by social scientists, *1012 and "replicating what would eventually take place in all fifty states," in 1972, our Legislature enacted the Grandparent and Sibling Visitation Statute, N.J.S.A. 9:2-7.1 (Visitation Statute). Moriarty, supra, 177 N.J. at 98, 827 A.2d 203 (citing L. 1971, c. 420, § 1) (footnote omitted).
In its original form, the Visitation Statute permitted visitation only if the parents of the child were deceased or divorced. Id. at 98-99, 827 A.2d 203. As amended in 1973, the Visitation Statute "afforded standing to grandparents to seek visitation when `either or both of the parents of a minor child ... is or are deceased, or divorced or living separate and apart in different habitats....'" Ibid. (quoting N.J.S.A. 9:2-7.1 (as amended by L. 1973, c. 100, § 1)). Under that scheme, "`intact families' (those not disrupted by death or divorce) were not subject to statutory visitation rights of grandparents." Moriarty, supra, 177 N.J. at 99, 827 A.2d 203. That limitation was excised from the Visitation Statute in 1993, paving the way for grandparents to be granted visitation with their grandchildren over the objections of biological parents living in an intact family. Ibid. (citing N.J.S.A. 9:2-7.1 (as amended by L. 1993, c. 161, § 1 (effective June 29, 1993))).

B.
Meanwhile, the social sciences began to investigate the importance of sibling relationships to a child's emotional well-being. As observed recently by Justice Albin in New Jersey Division of Youth & Family Services v. S.S.:
The importance of sibling relationships is well recognized by our courts and social science scholars. In L. v. G., the court stated that "[a] sibling relationship can be an independent emotionally supportive factor for children in ways quite distinctive from other relationships, and there are benefits and experiences that a child reaps from a relationship with his or her brother(s) or sister(s) which truly cannot be derived from any other." 203 N.J.Super. 385, 395 [497 A.2d 215] (Ch.Div.1985). According to that court, "[t]he bonds which develop between brothers and sisters are strong ones, and are, in most cases, irreplaceable." Id. at 398 [497 A.2d 215]. Some mental health experts believe that the sibling relationship can be "longer lasting and more influential than any other, including those with parents, spouse, or children[,]" and that "[w]hen it is severed, the fallout can last a lifetime." Nat'l Adoption Info. Clearinghouse, The Sibling Bond: Its Importance in Foster Care and Adoptive Placement 1, [2] (1992), [http://64.78.32. 155/training/upload/fosterclub_214.pdf]; see also Ellen Marrus, "Where Have You Been, Fran?" The Right of Siblings to Seek Court Access to Override Parental Denial of Visitation, 66 Tenn. L. Rev. 977, 987 (1999) ("[O]ver the course of an entire lifespan, siblings have significant influence on each other's lives. If nurtured and maintained, these relationships can provide emotional security, affect the intellectual, social, emotional, and moral development of one another, and offer lifetime companionship.").
[187 N.J. 556, 560-61, 902 A.2d 215 (2006); see also William Wesley Patton & Dr. Sara Latz, Severing Hansel from Gretel: An Analysis of Siblings' Association Rights, 48 U. Miami L. Rev. 745, 761 (1994) ("Brothers and sisters spend more time together and have longer relationships with one another than children have with their parents." (citing Th. Powell & P.A. Ogle, Brothers and Sisters: A Special Part of Exceptional Families (1985))).]
*1013 The bond between brothers and sisters "is often experienced `viscerally, forcefully, without conscious understanding, but with a sixth sense that this relationship is a vital key to one's own knowledge of one-self.'" Paige Ingram Castaneda, O Brother (or Sister), Where Art Thou: Sibling Standing in Texas, 55 Baylor L.Rev. 749, 773-74 (2003) (quoting Stephen P. Bank & Michael D. Kahn, The Sibling Bond 60 (1982)).
Clearly, if sibling bonds are important in healthy families, they are critical to children who experience chaotic circumstances. Indeed, children who have been abused or neglected, or whose families have been ripped apart, face heightened levels of emotional stress and, in such circumstances, they "`learn very early to depend on and cooperate with each other to cope with their common problems.'" ACNJ Special Report, Post-Adoption Sibling Contact: Some Issues to Consider (Sept. 2006), http://www.acnj.org/admin. asp?uri=2081&action=15&di=863&ext= pdf&view=yes (quoting The Sibling Bond, supra, at 1-2).
Socially, a sibling often becomes a child's first friend. Furthermore, if the child is not yet of school age, a sibling may also be the only friend.... Examining the available sibling research reveals that an adoptive child's separation from biological parents coupled with the loss of his major, or only, source of social support may be extremely traumatic.

[Meghann M. Seifert, Sibling Visitation After Adoption: The Implications Of The Massachusetts Sibling Visitation Statute, 84 B.U. L. Rev. 1467, 1488 (2004) (citations omitted) (emphasis added).]
As a result of that new understanding by social scientists, in 1987 our Legislature added siblings to the Visitation Statute. L. 1987, c. 363, § 2.[5] Initially the Act did not specify the standards to be applied in deciding a visitation application. Assem. B. No. 979/1091 (Statement, Senate Amendments), 205th Leg. 2 (N.J.1993).
In its present form, the Visitation Statute provides:
a. A grandparent or any sibling of a child residing in this State may make application before the Superior Court, in accordance with the Rules of Court, for an order for visitation. It shall be the burden of the applicant to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child.
b. In making a determination on an application filed pursuant to this section, the court shall consider the following factors:
(1) The relationship between the child and the applicant;

*1014 (2) The relationship between each of the child's parents or the person with whom the child is residing and the applicant;
(3) The time which has elapsed since the child last had contact with the applicant;
(4) The effect that such visitation will have on the relationship between the child and the child's parents or the person with whom the child is residing;
(5) If the parents are divorced or separated, the time sharing arrangement which exists between the parents with regard to the child;
(6) The good faith of the applicant in filing the application;
(7) Any history of physical, emotional or sexual abuse or neglect by the applicant; and
(8) Any other factor relevant to the best interests of the child.
c. With regard to any application made pursuant to this section, it shall be prima facie evidence that visitation is in the child's best interest if the applicant had, in the past, been a full-time caretaker for the child.
[N.J.S.A. 9:2-7.1 (as amended by L. 1993, c. 161, § 1).]
That statute is important because it reflects a constantly evolving legislative response to changing understandings of social conditions and a recognition that maintaining contacts with third parties, including grandparents and siblings, may, in certain circumstances, be necessary to the emotional health of children.
That is the backdrop for our inquiry.

IV.
We turn first to the issue of sibling visitation after a child is placed outside his home. That is governed by the Child Placement Bill of Rights Act, N.J.S.A. 9:6B-4(f). Although the Division divides placement into the periods before and after parental rights are terminated, suggesting that the Child Placement Bill of Rights Act applies to the former and not the latter, the Legislature has made no such distinction. The Child Placement Bill of Rights Act explains the rights of children during the entire placement period. Indeed, the legislative findings that led to the Child Placement Bill of Rights Act declared, in relevant part:
a. A child placed outside his home by the Department of Human Services, the Department of Children and Families, the Department of Health and Senior Services or a board of education, or an agency or organization with which the applicable department contracts to provide services has certain specific rights separate from and independent of the child's parents or legal guardian by virtue of his placement in another residential setting;
b. The State has an affirmative obligation to recognize and protect these rights through its articulation of a clear and specific bill of rights that reflects the best interests of the child whereby the safety of the child is of paramount concern and an affirmation by the State of its commitment to enforce these rights in order to protect and promote the welfare of the child placed outside his home[.]
[N.J.S.A. 9:6B-2 (emphasis added).]
Among the rights detailed in the Child Placement Bill of Rights Act are the following:

A child placed outside his home shall have the following rights, consistent with the health, safety and physical and psychological welfare of the child and as appropriate to the individual circumstances of the child's physical or mental development:

*1015 d. To the best efforts of the applicable department to place the child in the same setting with the child's sibling if the sibling is also being placed outside his home;
....
f. To visit with the child's sibling on a regular basis and to otherwise maintain contact with the child's sibling if the child was separated from his sibling upon placement outside his home, including the provision or arrangement of transportation as necessary [.]
[N.J.S.A. 9:6B-4 (emphasis added).]
The requirements of paragraph (f) have been viewed as expressive of the Legislature's intent "to assist in the micro-management of sibling visits" because they are so important. William Wesley Patton, The Status of Siblings' Rights: A View into the New Millennium, 51 DePaul L. Rev. 1, 21 (2001).
The purposes underlying the Child Placement Bill of Rights Act include ensuring that (1) the "best efforts to be able to remain with siblings" are taken and that (2) "regular visits with siblings" are afforded to every child placed outside the home. Assem. Judiciary, Law & Pub. Safety Comm., Statement to Assem. B. No. 1210, 204th Leg. 1 (N.J.1991) (emphasis added). Plainly, the Child Placement Bill of Rights Act does not eliminate those requirements upon termination of parental rights. Rather, the Legislature chose not to fractionalize the placement period into pre- and post-termination because it recognized that there is nothing about the legal act of termination, in itself, that magically alters the child's day-to-day life or that would justify cutting off pre-existing sibling contact. More importantly, by devolving an "affirmative obligation" on the Division to nurture sibling relationships during the entire placement period, the Legislature ensured a continuity of support for the child from the beginning to the end of his odyssey. Indeed, the Child Placement Bill of Rights Act makes maintenance of sibling contact a responsibility. That responsibility inheres even after pre-adoptive placement, which may or may not come to fruition. It is not an option. When the Division removes a child from his home, its obligation to nurture sibling bonds exists whether or not a sibling has initiated the process and whether or not termination has occurred.
The Division's own regulations underscore that duty. See, e.g., N.J.A.C. 10:122D-1.1 to -1.15 (setting forth regulations governing development of visitation plan); N.J. Div. of Youth & Family Servs. v. N.J., 412 N.J.Super. 357, 363-64, 990 A.2d 712 (App.Div.2010) (discussing DYFS's promulgation of administrative regulations pursuant to "its responsibilities under the [Child Placement Bill of Rights] Act, ... `to ensure that each child' placed out-of-home has the opportunity to visit with siblings, so as to reinforce the child's identity and maintain family relationships, among other things." (quoting N.J.A.C. 10:122D-1.1(a))). The regulations note that sibling visitation "may serve to: 1. Reinforce the child's identity; 2. Promote the child's need for stability, consistency, and permanency; [and] 3. Maintain or establish family relationships...." N.J.A.C. 10:122D-1.1.
The Division's responsibility to keep siblings together and, if that is not possible, to ensure visitation is also contained in the DYFS II Field Operations Casework Policy and Procedures Manual (DYFS II Manual), which promotes sibling visitation if the Division is unable to keep siblings placed outside of the home together. S.S., supra, 187 N.J. at 561, 902 A.2d 215; see also N.J., supra, 412 N.J.Super. at 363-64, 990 A.2d 712 (quoting DYFS II Manual § 1504). As the manual acknowledges, the *1016 reason for including visitation in the placement plan developed for each child placed outside of the home "is that `[m]aintaining contact with brothers and sisters supports the child's identity and links him to his past.'" N.J., supra, 412 N.J.Super. at 364, 990 A.2d 712 (quoting DYFS II Manual § 1504). Even when actual visitation is not feasible, the manual promotes contact through other means, including letters and telephone calls. N.J., supra, 412 N.J.Super. at 364, 990 A.2d 712.
Although the Visitation Statute generally casts the obligation on a third party seeking visitation to prove entitlement by a preponderance of the evidence, the Child Placement Bill of Rights Act alters that landscape in connection with siblings in the placement setting. Under the Child Placement Bill of Rights Act, the Division is obliged, on its own and even in the absence of an application by a sibling, to insure and facilitate such visitation under N.J.S.A. 9:6B-4(f), up until the time that an adoption is finalized.
It follows that, in a case in which the siblings of a child in placement seek visitation with that child, such visitation is the presumptive state of affairs. If the Division opposes visitation, it bears the burden of going forward with evidence to overcome the presumption. That evidence must address the standards provided in the Child Placement Bill of Rights Act. In particular, the Division is required to show that visitation would be inconsistent "with the health, safety, and physical and psychological welfare of the child" and is inappropriate "to the individual circumstances of the child's physical or mental development." N.J.S.A. 9:6B-4. It goes without saying that a foster family's disinclination to be involved in sibling visitation would not satisfy that standard; indeed, it is not even a relevant factor.
As far as we can tell from this meager record, the Division failed to live up to its obligations under the Child Placement Bill of Rights Act. Indeed, it did little to encourage visitation between Nellie and Hugo and the twins. For example, in April 2007, when Nellie requested visitation on weekends because of her work schedule and Hugo's school obligations, it took the Division more than three months to arrange a meeting. Although, by all accounts, that visit went well, no follow-up was scheduled and, in January 2008, the Division denied visitation outright when it rejected Nellie as a kinship placement candidate, although that is not a disqualifier in the statutes. Later, it refused further contact between the siblings because the foster mother was "no longer willing to facilitate visitation," despite its own obligations under the Child Placement Bill of Rights Act.
Essentially, the Division treated this case as a zero-sum game in which the bond between the foster mother and the twins somehow negated any sibling bond, such that no bonding evaluation of the siblings ever took place. Indeed, the Division never even considered whether Hugo's connection to the twins was important to him, although he was a minor child placed by the Division outside his home. Moreover, the Division apparently believed, incorrectly, that at the point at which Ms. Carson's parental rights were terminated, its own obligations under the Child Placement Bill of Rights Act ceased. Further, it seemed to view the rejection of Nellie as a kinship legal guardian for the twins as separately triggering a bar to visitation, again contrary to the statutes. Finally, it improperly ceded its decision-making obligations to the foster mother when she opted to withdraw her cooperation with respect to visitation.
*1017 More importantly, in court the Division presented little or no evidence bearing on the factors deemed relevant in the Child Placement Bill of Rights Act or the Visitation Statute, thus leaving the trial judge with no basis on which to support a denial of visitation in the interim period prior to adoption, save her wrong notion that the Division and the foster mother had absolute hegemony over the issue.[6]
The tragedy that flowed from the Division's lackadaisical, and later hostile, attitude toward sibling visitation was that it created a further justification for refusing to consider Nellie as a custodian. Indeed, the Division argued that too much time had elapsed since the siblings had contact; no bond had formed between the siblings; and the bond with the foster mother had deepened. Because Nellie has given up her pursuit of custodial rights to the twins, that issue is not before us. We nevertheless express our disapproval of the way in which the matter was handled during the placement period because it stacked the deck against Nellie's quest for custody.

V.
The adoption of the twins is imminent; we therefore turn to the issue of whether Nellie and Hugo have a right to petition for visitation with the twins after the adoption. We begin by distilling the parties' arguments on that subject to their essence. Nellie contends that the importance of sibling relationships is well established; that, where it is necessary to a child's emotional health, such visitation must be permitted even over the adoptive mother's objection; and that there is nothing in our prior jurisprudence that would preclude a post-adoption visitation order under proper circumstances.
The Division counters that adoptive parents are entitled to all of the protections provided to a biological family, including the right to reject sibling visitation; that our prior decision in In re Adoption of a Child by W.P., 163 N.J. 158, 748 A.2d 515 (2000), laid the issue of post-adoption visitation to rest; that forced post-adoption visitation will chill prospective adoptions in New Jersey; and, finally, that even if in some extraordinary cases, compelled post-adoption visitation will be necessary, the facts of this case do not justify such an action. We think that Nellie has the better of the arguments.

A.
The notion that parents have a right to autonomy in deciding how to rear their children has deep roots in our history and culture. Moriarty, supra, 177 N.J. at 101, 827 A.2d 203. Indeed, that right, which flows out of privacy concerns, has been denominated as a fundamental liberty interest entitled to constitutional protection. Wisconsin v. Yoder, 406 U.S. 205, 232-33, 92 S.Ct. 1526, 1541-42, 32 L.Ed.2d 15, 35 (1972) (describing primary role of parents in childrearing as "enduring American tradition"); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944) (noting "private realm of family life which the state cannot enter"); V.C. v. M.J.B., 163 N.J. 200, 218, 748 A.2d 539, cert. denied, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 243 (2000) (attributing right of legal parent to care and custody of child to notion of privacy). In short, the primary role of parents in the upbringing of their children is clear beyond cavil both *1018 in federal jurisprudence, Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551, 558-59 (1972), and in our own case law, V.C., supra, 163 N.J. at 217-18, 748 A.2d 539; Watkins v. Nelson, 163 N.J. 235, 245, 748 A.2d 558 (2000); In the Matter of the Guardianship of K.H.O., 161 N.J. 337, 346, 736 A.2d 1246 (1999).

B.
However, the constitutional right to family integrity is not absolute. Prince, supra, 321 U.S. at 166-67, 64 S.Ct. at 442, 88 L.Ed. at 652-53; V.C., supra, 163 N.J. at 218, 748 A.2d 539.
Thus, for example, our courts have overridden the desires of parents who refused to consent to medical treatment and ordered such treatment to save a child's life. See Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979) ("Nonetheless, we have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." (citations omitted)); Prince, supra, 321 U.S. at 166-67, 64 S.Ct. at 442, 88 L.Ed. at 652-53 (noting that state, as parens patriae, can intrude on parental autonomy to protect child from ill health or death); Jehovah's Witnesses v. King County Hosp. Unit No. 1, 278 F.Supp. 488, 498-99, 504-05 (W.D.Wash.1967) (holding Washington State statute that declared children to be dependents of state for purpose of authorizing blood transfusions against expressed wishes of parents was constitutional), aff'd, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (per curiam); State v. Perricone, 37 N.J. 463, 474, 181 A.2d 751 (finding state may act under its parens patriae authority to protect child's welfare by declaring him or her neglected to obtain necessary medical treatment), cert. denied, 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed. 2d 124 (1962); Muhlenberg Hosp. v. Patterson, 128 N.J.Super. 498, 503, 320 A.2d 518 (Law Div.1974) (ordering blood transfusion to infant over parents' wishes).
[Fawzy v. Fawzy, 199 N.J. 456, 474, 973 A.2d 347 (2009) (quoting Moriarty, supra, 177 N.J. at 102-03, 827 A.2d 203); see also Hojnowski v. Vans Skate Park, 187 N.J. 323, 901 A.2d 381 (2006) (invoking parens patriae doctrine to invalidate exculpatory waiver executed by parent on behalf of minor child).]
"Indeed, the state has an obligation, under the parens patriae doctrine, to intervene where it is necessary to prevent harm to a child." Fawzy, supra, 199 N.J. at 474-75, 973 A.2d 347 (footnote omitted) (citations omitted).

C.
Under the New Jersey Adoption Act, N.J.S.A. 9:3-37 to -56 (Adoption Act), "[t]he entry of a judgment of adoption shall establish the same relationships, rights, and responsibilities between the child and the adopting parent as if the child were born to the adopting parent in lawful wedlock." N.J.S.A. 9:3-50 b (as amended by L. 1993, c. 345, § 13). The purpose of the Adoption Act is to grant the adoptive family the same rights as a biological family and to recognize that entity as a new family unit, entitled to all of the protections afforded a biological family. "[A]fter a final judgment of adoption, the adoptive parents are, in the eyes of the law, the parents of that child[.]" In re Adoption of Child of Indian Heritage, 111 N.J. 155, 184, 543 A.2d 925 (1988). "[A]n adoptive [mother] ... is `for every purpose and from every perspective and in any terms save blood as much the maternal parent to the child as is any other mother *1019 to her daughter.'" W.P., supra, 163 N.J. at 175-76, 748 A.2d 515 (quoting Mimkon, supra, 66 N.J. at 441, 332 A.2d 199).
In other words, because adoptive families stand in the shoes of biological families, the Division correctly argues that they have the same right to family privacy and autonomy as the latter. However, an adoptive family is not entitled to greater protections than a biological family. Thus, to the extent that visitation by a third party may be compelled over the objections of a biological family, the same rule applies to an adoptive family.

VI.
A recap of our relevant case law is instructive here. In W.P., on which the Division relies for the proposition that adoptive families are immune from the operation of the Visitation Statute, we were faced with application by grandparents whose grandchild had been adopted by non-relatives who objected to continued contact between the grandparents and the children. W.P., supra, 163 N.J. at 160, 748 A.2d 515. In ruling, we looked to the history of the Adoption Act and the Legislature's failure to enact an open adoption statute and concluded that "the Legislature did not intend the [Visitation Statute] to apply to situations where the child is adopted by nonrelative adoptive parents[,]" and thus to subject the adoptive parents to a "best interests" hearing. Id. at 171, 748 A.2d 515. Critical to our reasoning in W.P. was our desire not to "relegate the adoptive parents to `second-class status.'" Id. at 175, 748 A.2d 515 (quoting Mimkon, supra, 66 N.J. at 441, 332 A.2d 199 (Clifford, J., dissenting)). In other words, because we recognized that a biological family could not be forced to permit a third-party access to its child based on a "best interests" analysis, we afforded adoptive families the same protection.
On the same day that we decided W.P., we also decided Watkins and V.C., two cases that shed light on the subject before us. In Watkins, we addressed a struggle over custody between the parents of the deceased mother of a three-and-one-half-year-old child and the child's biological father. 163 N.J. at 237, 748 A.2d 558. The Appellate Division, applying a best interests standard, ruled in favor of the child's maternal grandparents. Id. at 241, 748 A.2d 558. We reversed, based on our conclusion that the application of the best interests standard violated the fundamental right of the father to family autonomy. Id. at 243-44, 748 A.2d 558. In ruling, Justice Coleman, speaking for the Court, reaffirmed the fundamental "right of natural parents to the custody, care and nurturing of their children":
Since the right of parents to the custody of their minor children is both a natural and legal right, the law should not disturb the parent/child relationship except for the strongest reasons and only upon a clear showing of a parent's gross misconduct or unfitness or of other extraordinary circumstances affecting the welfare of the child.
[Id. at 245, 748 A.2d 558 (quoting In re D.T., 200 N.J.Super. 171, 176-77, 491 A.2d 7 (App.Div.1985)).]
He went on:
The principle that a showing of gross misconduct, unfitness, neglect, or "exceptional circumstances" affecting the welfare of the child will overcome this presumption, is a recognition that a parent's right to custody is not absolute. That parental right must, at times, give way to the State's parens patriae obligation to ensure that children will be properly protected from serious physical or psychological harm. In re Guardianship of K.H.O., 161 N.J. 337, 347 [736 *1020 A.2d 1246] (1999); In re Guardianship of J.C., 129 N.J. 1, 10 [608 A.2d 1312] (1992). This has been our law for more than a century. As early as 1889, the highest Court in this State allowed the presumption in favor of a natural parent to be overcome by a showing of "exceptional circumstances." Richards v. Collins, 45 N.J.Eq. 283 [17 A. 831] (E. & A.1889).
[Watkins, supra, 163 N.J. at 246, 748 A.2d 558.]
Importantly, in distinguishing between best interests and the proper standard gross misconduct, unfitness, or "exceptional circumstances"the Court observed:
A significant difference between the child's best interests test and the parental termination or "exceptional circumstances" standard is that the former does not always require proof of harm to the child. In contrast, the latter always requires proof of serious physical or psychological harm or a substantial likelihood of such harm.
[Id. at 248, 748 A.2d 558.]
Put another way, in Watkins we recognized, as we had in W.P., that permitting third-party contact with a child over the objections of the parents based on a best-interests standard is an unwarranted incursion on the fundamental right of the parents to raise their children as they see fit. At the same time, however, we spoke directly to a matter not raised in W.P. that the particular facts of a case could require us to exercise our parens patriae jurisdiction and permit third-party contact with a child over his biological parents' objection in order to protect the child from harm.
The same theme was sounded in V.C., in which the plaintiff and defendant lived together as same-sex partners. 163 N.J. at 205, 748 A.2d 539. The defendant was the biological parent of the minor twins, who had been conceived by artificial means while the parties were together. Id. at 206-07, 748 A.2d 539. The plaintiff and defendant lived in a familial setting with the children, who viewed them both as parents. Id. at 207, 748 A.2d 539. When they broke up, defendant objected to plaintiff's continued contact with the children, claiming that parental autonomy entitled her to bar the plaintiff, whom she denominated as a third party, from intruding into her family's life. Id. at 214, 748 A.2d 539. As we had in Watkins, we invoked the extraordinary circumstances doctrine to justify the exercise of our intervention on parens patriae grounds to avoid harm to the children. Because the plaintiff had functioned as a psychological parent to the children and because we recognized "that children have a strong interest in maintaining the ties that connect them to adults who love and provide for them[,]" id. at 221, 748 A.2d 539, we exercised our parens patriae jurisdiction, affirming the Appellate Division's order denying the plaintiff joint legal custody but granting her continued contact with the children through visitation. Id. at 229-30, 748 A.2d 539.
We adopted the same standard in Moriarty, supra, 177 N.J. 84, 827 A.2d 203, in order to save the Visitation Statute from constitutional infirmity. That case involved an application by grandparents for visitation with their grandchildren (the offspring of their deceased daughter) over the objection of the children's father. Acknowledging the constitutional imperative of family autonomy, we held that the best interest standard would constitute an incursion on that autonomy and recognized that "grandparents seeking visitation under the statute must prove by a preponderance of the evidence that denial of the visitation they seek would result in harm to the child." Id. at 88, 827 A.2d 203.
We concluded:

*1021 [T]hat the only state interest warranting the invocation of the State's parens patriae jurisdiction to overcome the presumption in favor of a parent's decision and to force grandparent visitation over the wishes of a fit parent is the avoidance of harm to the child. When no harm threatens a child's welfare, the State lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit. However, when harm is proved and the presumption in favor of a fit parent's decision making is overcome, the court must decide the issue of an appropriate visitation schedule based on the child's best interests.
[Id. at 115, 827 A.2d 203; see also In re Adoption of a Child by D.M.H., 135 N.J. 473, 495, 641 A.2d 235, cert. denied sub nom., Hollingshead v. Hoxworth, 513 U.S. 967, 115 S.Ct. 433, 130 L.Ed.2d 345 (1994) (citing In re Guardianship of J.C., 129 N.J. 1, 26, 608 A.2d 1312 (1992) as recognizing that to avoid harm to child some public-agency adoptions may require continued contact with natural parents).]
The foregoing authority, including W.P., constitutes a seamless expression of the principle that the application of the best interests standard to a third party's petition for visitation is an affront to the family's right to privacy and autonomy and that interference with a biological or adoptive family's decision-making can only be justified on the basis of the exercise of our parens patriae jurisdiction to avoid harm to the child.
Under those rulings, siblings can petition for visitation with their brothers and sisters who have been adopted by non-relatives, subject to the avoidance of harm standard. We can envision, for example, a case in which pre-teen siblings, raised together in the same household, deeply entwined in each other's lives, are removed due to abuse or neglect. If one is adopted by a non-relative and the other taken in by his grandmother, it seems likely to us that denial of the sibling's application to visit his adopted brother would satisfy the harm threshold. To the contrary, it is less clear that siblings separated at birth and raised in different households with no interaction whatsoever would be able to vault the threshold.
Obviously, the analysis is a fact-intensive one in which the sibling "bear[s] the burden of establishing by a preponderance of the evidence that visitation is necessary to avoid harm to the child." Moriarty, supra, 177 N.J. at 117, 827 A.2d 203. Any evidence, expert or factual, that bears on the question of harm to the child should be admitted. It is for the trial judge to determine whether the burden has been satisfied. "If the court agrees that the potential for harm has been shown, the presumption in favor of parental decision making will be deemed overcome." Ibid. At that point, if the adoptive family offers a satisfactory visitation schedule, the case will be over. "If not, a second step will be undertakenan assessment of the schedule." Ibid. In that respect, the court should impose a schedule that it finds is in the child's best interests, Watkins, supra, 163 N.J. at 238, 748 A.2d 558, "based on the application of the statutory factors." Moriarty, supra, 177 N.J. at 117, 827 A.2d 203 (citing N.J.S.A. 9:2-7.1 (listing statutory factors); Watkins, supra, 163 N.J. at 254, 748 A.2d 558).

VII.
That brings us to this case. Although the application of the avoidance of harm standard to a sibling's quest for visitation *1022 is well established in our prior jurisprudence, the courts below did not approach the case that way, at once viewing W.P. too narrowly and the power of the adoptive family and the Division too broadly. To be sure, Nellie will have an uphill battle to prove by a preponderance of evidence that denial of visitation would result in harm to the twins because of the time that has elapsed without contact, through no fault of her own. Nevertheless she should have a chance to do so. We therefore remand the matter for an expedited evidentiary hearing at which Nellie will have the opportunity to demonstrate by expert and factual evidence that the twins would suffer harm if denied visitation with her and Hugo.[7]
Among the relevant issues will be whether Nellie was ever a full-time caretaker of the twins as contemplated by the Visitation Statute and what relationship, if any, was enjoyed by Hugo and the twins with whom he visited regularly while he was in a group home. Indeed, no bonding assessment of Nellie, Hugo, and the twins ever took place, nor was any consideration given to the effect of a denial of visitation on Nellie and Hugo.
Moreover, we do not know what has happened to the parties since the lower courts' orders. Has any visitation occurred? Have the siblings been permitted telephone calls, letters, or e-mail? In short, we remand the matter because this record is an inadequate vehicle for us to determine the life-altering issue of whether the twins would be harmed by severance of visitation with Nellie and Hugo. The hearing we have ordered should be held without delay.

VIII.
One final note. This opinion should not be viewed as an incursion on the deeply-embedded right of fit parents, biological or adoptive, to raise their children without outside interference. That right is well-established, Yoder, supra, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15, and the parens patriae exception that has been recognized for over half a century, Prince, supra, 321 U.S. 158, 64 S.Ct. 438, 442, 88 L.Ed. 645, is narrowly tailored to avoid harm to the child.
The standard is a stringent one, Moriarty, supra, 177 N.J. at 113, 827 A.2d 203, that cannot likely be satisfied by siblings who have had no connection to each other or by those whose bonds are flaccid, or worse, toxic. Moreover, we note that the application of the harm standard to permit grandparent visitation over the objection of biological families has not opened the floodgates of litigation. Indeed, in the seven years since Moriarty, not a single reported or unreported opinion has issued on that subject. We take it from that state of affairs that if there are legitimate requests for visitation, parties are resolving them amicably, all the while keeping in mind what is best for the affected children.
More importantly, we credit families who engage in the unique, altruistic act of adoption with more perseverance than does the Division. Indeed, the desire to become a parent has deep emotional roots and it seems doubtful to us that families who have committed to adoption would simply drop out of the queue due to the possibility of non-harmful sibling visitation.
In that connection, persons who adopt older children obviously understand that the adoptee is not an empty slate. Like all *1023 of us, the child is the agglomeration of all the relationships and happenstances, good or bad, of his or her lifetime. There is simply no use in pretending that a deep bond between siblings who have been adopted does not exist.
Moreover, potential adoptive families are aware that, under the best of circumstances, adopted children experience more emotional stressors than their non-adopted peers. See, e.g., David Brodzinsky, Long-Term Outcomes in Adoption, 3 Future of Children 153, 162 (1993). "[A]s a group they are more vulnerable to various emotional, behavioral, and academic problems than their nonadopted peers living in intact homes with their biological parents." Id. at 153.[8]
With that as a given, it is hard for us to imagine an adoptive family's objection to a child continuing an emotionally sustaining relationship with a sibling who presents no negative safety or influence issues. In reality, those are the only siblings who have the potential to vault the harm threshold.
To be sure, such parents will be denied some measure of power over their children's associations as would be the case in a biological family. We view that diminution of parental autonomy as a proper exchange for the protection of the child under our constitutional parens patriae jurisdiction.

IX.
The judgment of the Appellate Division is reversed. The matter is remanded for proceedings consistent with the principles to which we have adverted.
For reversal and remandmentChief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS7.
OpposedNone.
NOTES
[1] Although the Attorney General's letter alludes to "foster parents," the record of DYFS's contact with the foster home only discusses a foster mother.
[2] All parties' names have been changed.
[3] Donald was initially placed in Nellie's legal custody by the State of New York, but was removed in 2009.
[4] Both twins suffer from developmental disabilities, and at least one uses a nebulizer to treat possible asthma.
[5] Like our own state, other legislatures and courts across the country have begun to protect sibling relationships as well. See, e.g., Ark.Code Ann. § 9-9-215(c) (2005); 750 Ill. Comp.Stat. 5/607(a-3) (2010); Ind.Code Ann. §§ 31-28-5-3 and -4 (2008); Iowa Code § 232.108 (2007); La. Child. Code Ann. art. 1218(d) (2003); Me.Rev.Stat. Ann. tit. 22 § 4068(2) (2005); Nev.Rev.Stat. Ann. § 125C.050 (2001); N.H.Rev.Stat. Ann. § 169-C:19-II(a) (2008); N.Y. Dom. Rel. Law § 71 (1989); N.Y. Fam. Ct. Act § 1027-a (1990); Ohio Rev.Code Ann. § 3109.051(B) (2005); R.I. Gen. Laws § 15-5-24.4 (1996); Wash. Rev.Code. § 13.34.130(4) (2010); In re Miguel A., 156 Cal.App.4th 389, 67 Cal. Rptr.3d 307, 310-11 (2007); In re Tamara R., 136 Md.App. 236, 764 A.2d 844, 854-56 (2000); Adoption of Lenore, 55 Mass.App.Ct. 275, 770 N.E.2d 498, 506 (2002); Lindsie D.L. v. Richard W. S., 214 W.Va. 750, 591 S.E.2d 308, 315 (2003). But see Va.Code Ann. § 63.2-1215 (2003) (providing that blood relatives "shall, by final order of adoption, be divested of all legal rights and obligations in respect to the child including the right to petition any court for visitation with the child.").
[6] As we have noted, at the Division's urging, during the period in which the foster mother was cooperating with visitation, the trial judge relieved the Division of any financial or supervisory obligations in direct contravention of the Child Placement Bill of Rights Act, N.J.S.A. 9:6B-4(f).
[7] Obviously, if for any reason the adoption is not consummated, the principles we set forth in Part IV will apply.
[8] It is that vulnerability that has paved the way for the continuing debate on whether adoptees should be permitted to know their biological parents' names and to contact them. See S. 799, 214th Leg. (N.J.2010); S. 1399, 214th Leg. (N.J.2010); Assem. B. No. 1406, 214th Leg. (N.J.2010).