# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5221-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.F.H.,[1]

     Defendant-Appellant,

and

R.L.D.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF E.J.D.,

     a Minor.

_____

     Submitted September 10, 2019 – Decided September 25, 2019

---

[1] We utilize the parties' initials to assure confidentiality pursuant to Rule 1:38-(d).

Before Judges Yannotti and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FG-14-0013-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Clara S. Licata, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Tara Beth Le Furge, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Joseph Hector Ruiz, Designated Counsel, on the brief).

PER CURIAM

J.F.H. appeals from a June 27, 2018 Family Part order terminating her parental rights to E.J.D. born in March 2012. We affirm.

I.

J.F.H. is the biological mother of E.J.D.[2] J.F.H. has a long history with the Division of Child Protection and Permanency (Division). She has substance abuse and mental health issues, and she has been unable to maintain safe and

---

[2] E.J.D.'s father, R.L.D., surrendered his parental rights on June 8, 2018 to E.J.D.'s resource parents, the A. Family, and has not appealed.

stable housing. The Division conducted Dodd[3] removals of E.J.D. in 2014 and 2016, and after J.F.H. successfully completed certain services, she was reunited with E.J.D. in 2015. However, in 2016, the child was again removed from J.F.H.'s care, due to J.F.H.'s erratic behavior and placed with the A. Family, with whom she had been placed following the first removal. The Division made further efforts toward reunification but ultimately filed a complaint seeking termination of J.F.H.'s parental rights, with E.J.D.'s adoption by the A. Family.

The guardianship trial commenced in June 2018. We discern the following facts from evidence adduced at the trial.

J.F.H. was diagnosed with personality disorder and post-traumatic stress disorder (PTSD) resulting from a sexual assault she endured as a minor. Approximately ten years ago, J.F.H. was hospitalized at Greystone for one year after a suicide attempt.

In March 2012, the Division received a referral indicating that sixteen-day-old E.J.D. was present in the home during a domestic violence incident between her parents. Because E.J.D. was asleep in her crib at the time, J.F.H. was not substantiated for a neglect finding.

---

[3] A "Dodd removal" refers to the emergency removal of a child from the home without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

In May 2013, the Division received another referral after J.F.H. left E.J.D. in the care of M.H., the maternal grandmother, for four days. The Division investigated J.F.H.'s well-being and no further action was taken. In October 2013, the Division was contacted by the police expressing concerns for the child's safety following a domestic dispute between her parents. Neglect was not established and the family agreed to attend services.

In November 2013, the Division was notified that E.J.D. was left alone with R.L.D., but the Division could not substantiate allegations of substance abuse. In June 2014, the Division received another referral about R.L.D. punching J.F.H. in the home, notwithstanding a protective order in place, but neglect was not established as to J.F.H. Defendant admitted to continued marijuana use and M.H. moved to New Jersey from Texas to facilitate supervised contact between her daughter and granddaughter as ordered by the court. J.F.H. was ordered to undergo random drug screen testing, a substance abuse evaluation, a forensic evaluation, and to continue services.

In August 2014, J.F.H. was evaluated at Newbridge Child and Family Services. The evaluator recommended the continued use of Abilify—an antipsychotic medication—and weekly psychotherapy, based on finding J.F.H. "presented as emotionally unstable, immature and impulsive with a history of

poor judgment."  The report noted J.F.H. "was protective of [R.L.D.] and rationalized his alcohol use and violent behaviors."

The Division substantiated a finding of neglect and filed a verified complaint for custody of E.J.D. in October 2014.  The judge noted J.F.H.'s "heroic improvement" from participating in the VISTA program and the Jersey Battered Women's Service in 2014 and 2015.  J.F.H. obtained a final restraining order against R.L.D. in March 2015, and complied with recommended services, resulting in her reunification with E.J.D.

But another referral was made to the Division in March 2016 after E.J.D. was absent from her daycare center for three weeks.  J.F.H. informed the daycare staff that R.L.D. was arrested for beating her three weeks prior and E.J.D. witnessed the abuse, which the child confirmed.  J.F.H. presented as "unstable" and "aggressive" to the daycare staff.  E.J.D. stated that a babysitter "locked her in the closet when she urinated on the bed," and E.J.D. reported "seeing people cutting other people."  When the response unit came to J.F.H.'s home, she answered the door with no clothes on above her waist and holding a blanket in an unsuccessful attempt to cover her breasts, while she appeared "irate, elusive, angry and argumentative" during the interview.

5

In April 2016, J.F.H. and R.L.D. had a violent altercation while traveling on Route 46, resulting in J.F.H.'s arrest for striking him while he was driving. In order to escape J.F.H., R.L.D. ran across the highway with the child. E.J.D. told a caseworker "that her parents punch her and it hurts," and they constantly fight. In response, the Division attempted to establish a safety plan with J.F.H. but she refused to engage and was "cursing at and . . . being verbally aggressive with all Division personnel who attempt[ed] to speak with her," resulting in E.J.D.'s second removal.

Eloise J. Berry, Ph.D. of the Audrey Hepburn Children's House interviewed E.J.D. and found she suffered from "emotional dysregulation and anxiety that manifested as she discussed domestic violence between her parents and violent interactions through play that are likely enactments of that to which she has been exposed." Dr. Berry diagnosed E.J.D. with adjustment disorder with anxiety, confirmed child neglect, and child affected by parental relationship distress.

In June 2016, J.F.H. met with Sean Conlon, L.C.S.W., also affiliated with the Audrey Hepburn Children's House, for a psychological evaluation. In his report, Conlon noted J.F.H., "presented in a challenging, controlling, and petulant manner at times as she spoke quickly about many aspects of her own

functioning." Conlon noted that J.F.H.'s low self-esteem and "[h]er withdrawal may stem from the chronic nature of her behavioral apathy, depressive mood, and dependency behavior[,] as well as from her expectations of denigration."

A Center for Evaluation and Counseling (CEC) psychiatric evaluation performed in June 2016 recommended anger management services, psychotherapy, medication, and other treatment for J.F.H.'s bipolar disorder. After the second removal, J.F.H. exhibited "alarming and increasingly violent and bizarre actions and activity . . . ." She threatened to sue the Division and resource parents and told a caseworker "she was going to physically assault her and insulted [her] using foul language." However, in July 2016, J.F.H. executed a stipulation admitting "that her untreated mental illness placed her daughter at substantial risk of harm . . . ."

In September 2016, E.J.D.'s therapist reported to the Division that her "play often included violent themes and preoccupation with death." In fall of 2016, J.F.H. requested E.J.D. be placed with her first daughter, who was adopted by the G. Family of New York. An Interstate Compact Placement of Children (ICPC) assessment was conducted on December 28, 2016, and recommended placement. The report verified the G. Family was "very eager to have [E.J.D.] placed in their home."

7

J.F.H. blamed E.J.D.'s issues on her exposure to R.L.D.'s alcoholism, and she complained the Division did not provide her with necessary services, leading the judge to find her denial was "an ongoing theme with [J.F.H.], unfortunately, and it is referenced again and again in the expert report . . . how her inability or unwillingness to accept culpability is a significant barrier to remediating the issues that make her a danger to E.J.D."

In March 2017, the Division noted J.F.H. made "veiled threats toward staff" and she reported to police that Division employees assaulted her. A month later, the Division noted J.F.H.'s belligerence while questioning an allergy patch test on E.J.D.'s back, and J.F.H. told a supervisor to lose weight and called her derogatory names in Spanish.

Family Connections reported "an observable attachment between [J.F.H.] and E.J.D.[,]" and J.F.H. communicated with the child in a "developmentally appropriate manner." Nonetheless, the judge noted "the record suggests [J.F.H.'s] not able to do this with E.J.D. with any real consistency. These rare moments of appropriate interaction just simply [are not] enough when you consider the harm E.J.D. suffers from the other types of interactions." J.F.H. "exhibited low frustration tolerance, occasional erratic behavior, and difficulty modulating . . . her temperament during perceived slights."

Visitation was terminated on June 19, 2017 after J.F.H. "implied in her questions to the child that the resource parents inappropriately touched her." According to a caseworker, E.J.D. "appeared to be scared, confused, and actually said, 'Mommy needs to apologize.'" At the July 13, 2017 hearing, the Division changed its permanency plan from reunification to termination of parental rights. J.F.H. rummaged through her bag, yelled at her attorney, and argued with herself during the proceeding. Again, during visitation on July 26, 2017, J.F.H. insinuated there was inappropriate behavior by the resource parents.

The trial began on June 6, 2018, and J.F.H. was present but acting in a bizarre manner. Dr. Frank Dyer described the bond between J.F.H. and E.J.D. as affectionate but testified as to J.F.H.'s "great risk for some new episode . . . that would result in the child's removal again" and "abuse in terms of exposure to dramatic scenes of extreme interpersonal friction and possibly violence . . . ." He opined J.F.H.'s prognosis for a positive change is "very poor." James Karinge, the adoption caseworker, testified J.F.H. was uncooperative, failed to verify her medications, and "said she was going to do something to" the supervisor.

The judge heard testimony from the last witness on June 22, 2018 in the absence of J.F.H., but left the record open until June 27, 2018 in the event J.F.H. might appear and testify. The judge denied J.F.H.'s application for a further adjournment of the trial because it was unclear whether she would testify or be discharged from the hospital.

Moreover, the judge found J.F.H.'s rights were "particularly well-guarded" by her counsel. Karinge was allowed to testify and counsel provided their closing arguments. The judge emphasized that a further adjournment of the trial would be inconsistent with E.J.D.'s right to permanency, and he noted J.F.H. had not called any witnesses and "there would be little if anything that [she] could say" to change his mind.

The judge rendered an oral opinion. He found that the Division satisfied its burden of producing clear and convincing evidence to prove all four prongs of the best interests of the child standard.

On appeal, J.F.H. argues that the record does not support the trial court's conclusion as to prongs three and four, specifically kinship legal guardianship (KLG) with M.H., who was seventy-nine years old at the time of trial; the judge erred by denying her request for an adjournment of the trial; and the Division failed to satisfy its obligations under the Child Placement Review Act (CPRA),

N.J.S.A. 9:6B-4(d), because it allegedly failed to permit E.J.D. to have contact with her half-sister, who lives with the G. Family. We disagree and affirm.

## II.

We first address J.F.H.'s argument that the judge deprived her of due process by not granting her an adjournment on the last day of trial, and denying her the opportunity to meaningfully participate in the trial. While "[i]t is well [-]established as a matter of due process principle that procedural requirements are more demanding in parental termination cases than ordinary civil actions," due process "is a flexible concept and calls for such procedural protections as the particular situation demands." N.J. Div. of Youth and Family Servs. v. M.Y.J.P., 360 N.J. Super. 426, 464, 467 (App. Div. 2003).

> An action for termination of parental rights is a civil action. The requirements of due process do not confer a constitutional right of confrontation or mandate a parent's presence at the trial. The question to be answered is not whether particular procedures were used, but rather whether those procedures which were employed were appropriate and adequate to protect the interests at stake.
>
> Procedural due process standards require the opportunity for meaningful participation by the person at risk of limitation in any trial in which important rights or interests are to be adjudicated.
>
> [Id. at 467-68 (emphasis added) (citations omitted).]

In determining whether a parent's due process requirements have been met, our courts have applied the three-prong test set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976). This test requires the court to consider: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Ibid.

It is undisputed that J.F.H. has a protected liberty interest in "the care, custody, and management" of E.J.D., which is protected by the Fourteenth Amendment. Santosky v. Kramer, 455 U.S. 745, 753 (1982). Therefore, we must consider "whether the procedures used resulted in a deprivation of rights or interests that would have been more fully protected if other procedures had been used." M.Y.J.P., 360 N.J. Super. at 466.

Here, the judge agreed to postpone his decision if defense counsel could obtain an update on J.F.H.'s condition and her desire to testify. On June 27, 2018, the day the judge was scheduled to issue his decision, he noted J.F.H.'s attorney "has not had the opportunity to even discern whether the defendant

wishes to testify due to her recent hospitalization[;]" and that "we do not know when she will be released[,]" referring to a previous hospital stay that lasted six months; and her attorney was there "to protect her rights."

J.F.H. claims the judge did not implement any alternative procedures to safeguard her right to "a process with sufficient procedural integrity to protect her fundamental rights as a parent[,]" citing to M.Y.J.P., 360 N.J. Super. at 470. In M.Y.J.P., the defendant mother resided in Haiti and was unavailable to attend the guardianship trial. Id. at 432. She claimed her due process rights were violated, thereby denying her of a fair trial. Ibid.

We concluded the mother's due process rights were not violated because the trial court took appropriate and creative procedures to ensure her participation in the trial. Id. at 470. The mother

> was represented by aggressive, exceptionally competent counsel, was given the opportunity to testify by de bene esse deposition, review the trial transcripts, consult with her attorney, engage in deferred cross-examination of the Division's witnesses, and present rebuttal evidence. There has been no showing that her able counsel's cross-examination was adversely affected by the fact that his client was not present in the courtroom. In fact, through her deposition taken during the course of the trial, M.Y.J.P. was able to address fully any issue raised in the proceedings, including her decision to allow [the child] to remain in New Jersey. Thus, the process accorded to M.Y.J.P. was adequate to protect her interests, and there is no indication that any

13

> procedural safeguards could have been implemented that would have been more fulfilling.
>
> [Id. at 469.]

J.F.H. argues there were no alternatives presented to facilitate her potential testimony, despite her attorney's requests that the record be held open "in order to allow [J.F.H.] the opportunity to be stabilized with the medications and released from the hospital and in a position where she can either testify or waive her right to testify." We see no merit to J.F.H.'s argument. The judge adjourned the trial for five days to ascertain J.F.H.'s availability to testify but there was no update on her condition, and it was unclear if or when J.F.H. would be able to testify if she so chose. As in M.Y.J.P., J.F.H. was represented by capable counsel, who was able to cross-examine James Karinge on the last day of trial.

We are satisfied the judge properly considered the rights J.F.H. might be deprived of, while also evaluating E.J.D.'s right to permanency. "Children are entitled to permanency," N.J. Div. of Child Prot. & Permanency v. K.S., 445 N.J. Super. 384, 391 (App. Div. 2016), and "have an essential and overriding interest in stability" as rapidly as possible. In re Guardianship of J.C., 129 N.J. 1, 26 (1992). The child's interests in permanency "may restrict a parent's testimonial right." Here, the judge stated:

> Given the gravity of the issues presented in a guardianship trial, [J.F.H.'s] right to procedural and substantive due process is never more important. No less important, however, is E.J.D.'s right to permanency. E.J.D. has spent a total of almost [thirty-two] months in resource care. E.J.D. was removed and reunified and removed again.
>
> The same mental health issues that threatened the child's safety throughout her young life obviously still remain. Now [J.F.H.] is not physically available to parent because of yet another mental health hospitalization and the court is loath[] to delay the matter any longer.

### III.

Parents have a constitutionally protected right to enjoy a relationship with and to raise their children. In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). "The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard." Id. at 347. The best interests standard, initially formulated by the Court in N.J. Div. of Youth & Family Servs v. A.W., 103 N.J. 591, 604-11 (1986), is now codified in N.J.S.A. 30:4C-15.1(a), and requires the State to establish each of the following criteria by clear and convincing evidence before parental rights may be severed:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

15

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(1) to (4).]

The four criteria are not discreet and separate, but overlap to provide a comprehensive standard to identify a child's best interests. N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167 (2010) (citing N.J. Div. of Youth & Family Servs. v. G.L. 191 N.J. 596, 606-07 (2007)). The statute's four parts "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

The considerations involved are "extremely fact sensitive" and require particularized evidence that addresses the specific circumstances present in each case. Ibid. (citation omitted). Importantly, the Division bears the burden of

establishing each prong by clear and convincing evidence. <u>N.J. Div. of Youth & Family Servs. v. P.P.</u>, 180 N.J. 494, 506 (2004).

The scope of our review of a determination terminating a parent's rights is limited. "When a biological parent resists termination of his or her parental rights, the [trial] court's function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." <u>N.J. Div. of Youth & Family Servs. v. R.L.</u>, 388 N.J. Super. 81, 87 (App. Div. 2006) (citing <u>J.C.</u>, 129 N.J. at 10).

The factual findings which undergird such a judgment "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" <u>In re Guardianship of J.T.</u>, 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting <u>Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am.</u>, 65 N.J. 474, 483-84 (1974); <u>Meshinsky v. Nichols Yacht Sales, Inc.</u>, 110 N.J. 464, 475 (1988)). "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." <u>R.L.</u>, 388 N.J. Super. at 89. Applying these standards, we conclude

that there is sufficient credible evidence in the record to support the judge's findings as to all four prongs of the best interests test.

The first two prongs of the best interests test address the harm caused to a child and a parent's failure to mitigate that harm. N.J.S.A. 30:4C-15.1(a)(1) and (2). The focus of the first prong examines the impact of harm caused by the parent-child relationship on the child's safety, health, and development over time. P.P., 180 N.J. at 506. The harm facing the child "need not be physical . . . . Serious and lasting emotional or psychological harm to [a] child[] as the result of the action or inaction of [his or her] biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992).

In fact, the failure of a parent to provide a "permanent, safe, and stable home" engenders significant harm to a child. In re Guardianship of DMH, 161 N.J. 365, 383 (1999). Similarly, a "parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379 (citing K.H.O., 161 N.J. at 352-54). This constitutes a "failure to provide even minimal parenting . . . ." Ibid.

The second prong relates to "parental unfitness" and can be established by "demonstrat[ing] that the parent is 'unwilling or unable to eliminate the harm'

18

that has endangered the child's health and development . . . [or] demonstrat[ing that] . . . the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)).

As to prong three, N.J.S.A. 30:4C-15.1(a)(3) requires, in pertinent part, the Division to prove by clear and convincing evidence that it "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home." The third prong requires that the Division "undertake diligent efforts to reunite the family." K.H.O., 161 N.J. at 354. According to the statute,

> "reasonable efforts" mean attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:
>
> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, on order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c)(1) to (4).]

Whether the Division undertook diligent efforts to reunite the parent with the child is a fact-sensitive, individualized inquiry. DMH, 161 N.J. at 390.

The fourth prong "requires a determination that termination of parental rights will not do more harm than good to the child." K.H.O., 161 N.J. at 354-55. "A child's need for permanency is an important consideration under the fourth prong." N.J. Div. of Youth & Family Servs v. M.M., 189 N.J. 261, 281 (2007). It is well-established that to satisfy this prong, the Division should present a "'well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation' of the child's relationship with . . . the natural parents . . . ." Ibid. (quoting J.C., 129 N.J. at 19).

J.F.H. does not challenge the judge's finding under prong one that E.J.D.'s safety, health, and development are at risk of continued harm because of J.F.H.'s ongoing psychiatric issues and domestic violence with R.L.D.

J.F.H. also does not challenge the judge's finding under prong two that she is unwilling and unable to provide a safe and stable home for E.J.D. and further delay in permanency would add to the harm E.J.D. has already suffered. J.F.H.

20

is also not challenging the judge's finding that the Division made a reasonable effort to address the causes for the child's removal, as required by prong three.

IV.

J.F.H. also argues that the Division failed to establish the third prong of the best interests of the child standard because the Division failed to properly consider M.H. as a candidate for KLG. The Kinship Guardianship Act, N.J.S.A. 3B:12A-1(b), was created to provide children with safe and stable homes where "caregivers either are unable or unwilling to seek termination of the legal relationships between the birth parent and the child . . . . In these cases, adoption of the child is neither feasible nor likely . . . ."

The Act allows for KLG as an alternative to termination, and "is intended to be permanent and self-sustaining, as evidenced by the transfer to the caregiver of certain parental rights, but retains the birth parents' right to consent to adoption, the obligation to pay child support, and the parents' right to have some ongoing contact with the child[.]" Ibid. In considering KLG, the judge must decide if it is in the child's best interests and whether the Division has made reasonable efforts at reunification. N.J.S.A. 3B:12A-6(d).

Our Supreme Court has emphasized that KLG should only be utilized when adoption is neither feasible nor likely. P.P., 180 N.J. at 509. KLG "is not

intended as an equally available alternative to termination that must be considered in order to satisfy the third element of N.J.S.A. 30:4C-15.1[.]" Rather, "it is an intended option where parental neglect and poor prospects for change in the foreseeable future are established, but adoption 'is neither feasible nor likely,' the child is in the care of 'a family friend or a person with biological or legal relationship with the child,'" and is in the child's best interest. N.J. Div. of Youth & Family Servs. v. S.V., 362 N.J. Super. 76, 88 (App. Div. 2003) (quoting N.J.S.A. 3B:12A-2). The Court also held "[t]he plain language of the [Kinship Guardianship] Act, as well as its legislative history, establish [KLG] as a more permanent option than foster care when adoption" cannot be achieved. P.P., 180 N.J. at 512. In P.P., because grandparent adoption was feasible for the children, KLG was not available. Ibid. The Court further held "when the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights under N.J.S.A. 30:4C-15.1[(a)](3)." Id. at 513.

On appeal, J.F.H. argues the Division's assessment of M.H. as a KLG placement was "totally inadequate," and that it did not seriously explore M.H. for placement as KLG, thereby failing to meet its obligation under the third prong. We reject J.F.H.'s argument.

M.H. lives in Texas, but provided support to J.F.H. during E.J.D.'s first removal. M.H. met with a Division worker on May 5, 2016, approximately two weeks after E.J.D.'s second removal in April 2016. When asked if she could care for E.J.D., the Division case notes state M.H. "told worker that as a last option she would be willing to have her granddaughter live with her in Texas."

J.F.H. asserts M.H.'s purported interest in having E.J.D. adopted by the G. Family was based on an ICPC assessment being performed, and a Division worker clarified that M.H. could be explored concurrently with the G. Family. M.H. indicated she had to speak to her husband about a placement, leaving doubt as to her true intentions.

During a Family Team Meeting on December 8, 2016, the Division attempted to discuss M.H.'s availability for placement, but she never responded. Follow up phone calls by the Division to M.H. in September 2017 confirmed M.H. was not interested in adopting E.J.D. but M.H. was willing to serve as a guardian through KLG.

By this time, E.J.D. had been in the care of her resource parents for approximately two years. M.H. was ruled out as a KLG placement on October 13, 2017, due to her failure to timely respond to the Division and her expressed desire in having the G. Family adopt E.J.D. instead. The "rule out letter" also

detailed the Division's rightful concerns with placing E.J.D. with M.H. due to her involvement in the child's first removal, stating:

> On December 2, 2014, you were substantiated for [n]eglect; [i]nadequate supervision of your granddaughter [E.J.D.]. You admitted to abandoning your role of supervising the child with both of her parents due to substance abuse and left her alone with both parents for a day while you traveled out of state. Despite supervision being court ordered, you reported you did not believe that either parent required supervision. On April 18, 2016, you exhibited concerning behavior at the [local Division office] towards an employee. While speaking to the employee about your daughter, you stepped towards the worker and placed your hands around the worker's throat and began shaking the worker in a back and forth motion telling the worker this was what your daughter was like.

The letter indicated M.H. could "request a review of the decision by an agency representative who has no role in this case[,]" within twenty days, but she failed to do so.

Here, the record shows E.J.D. is thriving with the A. Family who shows a strong interest in adopting her, and M.H. told a caseworker she concurred in that plan because they adopted [E.J.D.'s] sibling and they were a good family. The record reflects the Division made several attempts to contact M.H. for potential permanent placement for E.J.D., but M.H. indicated she was only willing to

become a KLG. Because adoption is feasible and likely, KLG is not a defense to termination of J.F.H.'s parental rights. P.P., 180 N.J. at 513.

V.

J.F.H. contends the Division failed to establish prong four of the best interests of the child standard by clear and convincing evidence. She contends that the evidence shows E.J.D. is securely attached to her and will suffer significant harm from termination of the parental relationship. J.F.H. also argues for the first time on appeal, that the Division did not meet its obligations under the Child Placement Review Act (CPRA), N.J.S.A. 9:6B-4(d), because it failed to permit E.J.D. to have visitation with her half-sister, A.B., who lives with the G. Family. The judge recognized the bond between E.J.D. and the A. Family was strong and removing her from their care would be "dangerous[,]" and "[b]ecause E.J.D. has spent almost half of her life in the care of these resource parents, removal would harm her as there is nothing in the record that suggests that the grandmother could mitigate the harm such removal would . . . cause." Dr. Dyer, the sole expert who testified in this case, stressed the need for E.J.D. to have permanency and stability. He emphasized that she developed an attachment to her resource parents after her first removal and stressed J.F.H.'s

inability to ameliorate the harm E.J.D. would face if she was removed from the A. Family.

J.F.H. asserts she wanted E.J.D. placed with A.B., the G. Family expressed an interest in adopting E.J.D., and the Division failed to show placement with the G. Family would be contrary to E.J.D.'s best interests. J.F.H. argues that had visitation between E.J.D., the G. Family, and A.B. obtained, the Division may not have determined that E.J.D.'s adoption by the A. Family was in her best interests.

The CPRA provides:

> A child placed outside his home shall have the following rights, consistent with the health, safety and physical and psychological welfare of the child and as appropriate to the individual circumstances of the child's physical or mental development:
>
> > d. To the best efforts of the applicable department to place the child in the same setting with the child's sibling if the sibling is also being placed outside his home;
> >
> > . . . .
> >
> > f. To visit with the child's sibling on a regular basis and to otherwise maintain contact with the child's sibling if the child was separated from his sibling upon placement outside his home, including the provision or arrangement of transportation as necessary[.]

[N.J.S.A. 9:6B-4(d) and (f).]

Further, "[t]he requirements of paragraph (f) have been viewed as expressive of the Legislature's intent 'to assist in the micro-management of sibling visits' because they are so important." In re D.C., 203 N.J. 545, 563 (2010) (quoting William Wesley Patton, The Status of Siblings' Rights: A View into the New Millennium, 51 DePaul. L. Rev. 1, 21 (2001)). The underlying purposes of the CPRA are to ensure that "the 'best efforts to be able to remain with siblings' are taken, and that . . . 'regular visits with siblings' are afforded to every child placed outside the home. Id. at 563-64 (quoting Assem. Judiciary, Law & Pub. Safety Comm., Statement to Assem. B. No. 1210, 204th Leg. 1 (1991)).

Here, as of November 3, 2016, E.J.D. had never met A.G. The G. Family's ICPC assessment had been completed and their home was approved for placement on January 5, 2017. At that point, the goal of reunification was still in place, and the Division declined the approved placement of E.J.D. in the G. Family's home "as part of the ongoing efforts to support the reunification and expansion of visits between [E.J.D.] and her biological mother."

Once the circumstances changed, the Division switched its goal to adoption. In a letter dated October 18, 2017, the Division stated that E.J.D. had been living with the A. Family for twenty-four out of the seventy-two months

of her life, and E.J.D. "was [two-and-a-half] years old when she was initially placed in the custody of the Division and met her current resource parents. At age [four], [E.J.D] was again placed in the [c]ustody of the Division and was re-placed with her original resource parents where she remains in placement to date." The Division's "rule-out" authority is subject to the court's review of the child's best interest. J.S., 433 N.J. Super. at 69.

Consequently, there was no sibling relationship for the Division to maintain pursuant to the CPRA. The Division was not obligated to facilitate visitation to create a bond between E.J.D. and A.B. because they had never met. Instead, the Division chose to place E.J.D. with the family she spent two years of her life with, in the same state as J.F.H., while reunification was attempted again. When reunification failed, the Division determined it was in E.J.D.'s best interest to remain with the A. Family because of their desire to adopt her and for the sake of consistency. Based on this record, we conclude the Division did not violate its obligations under the CPRA.

There was clear and convincing evidence to find that terminating J.F.H.'s parental rights would not cause more harm than good.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

28                                                    A-5221-17T3